# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30658

United States Court of Appeals
Fifth Circuit

**FILED**

June 23, 2017

Lyle W. Cayce
Clerk

RENEE CREDEUR,

> Plaintiff - Appellant

v.

STATE OF LOUISIANA, Through the Office of the Attorney General,

> Defendant - Appellee

Appeal from the United States District Court
for the Middle District of Louisiana

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

Renee Credeur was employed by the Office of Attorney General for the State of Louisiana ("DOJ") as a litigation attorney. During the course of her employment, she developed serious health problems due to complications from a kidney transplant. On account of her illness, the DOJ granted her temporary accommodations to work from home with the goal of eventually reintegrating her into the office. After several months of telecommuting, the DOJ denied Credeur's continuing request to work from home, but provided an alternative accommodation with certain conditions. Credeur rejected this alternative accommodation and renewed her request to work from home. The DOJ denied her request. Credeur sued the DOJ for failure to accommodate, harassment,

No. 16-30658

and retaliation in violation of the American with Disabilities Act ("ADA") and Louisiana Employment Discrimination Law ("LEDL"). She appeals the district court's grant of summary judgment in the DOJ's favor. Because there is no genuine issue of material fact as to whether Credeur has established a prima facie case on any of her disability-based claims, we AFFIRM.

## I.     BACKGROUND

From 2008 to 2014, Credeur worked as an assistant attorney general in the Medical Malpractice Section of the DOJ's Litigation Division. Credeur underwent a kidney transplant in May 2010 and was granted an ADA accommodation to work from home for approximately six months. In 2013, Credeur experienced additional health problems due to complications from the kidney transplant. From March to August 2013, Credeur utilized leave under the Family and Medical Leave Act ("FMLA"). After she exhausted FMLA leave, Credeur requested the accommodation of working from home. She provided the DOJ with a medical evaluation by her physician, Dr. Slakey, who was treating her for kidney transplant complications. Dr. Slakey recommended that Credeur "begin working from home doing as much as possible and slowly incorporate herself back to office hours as she gains strength and endurance."

The DOJ granted Credeur an accommodation to work from home, memorialized in a memorandum dated October 13, 2013 (the "Strategy Memo"). The Strategy Memo noted the DOJ's intent to comply with the ADA by providing Credeur "reasonable accommodations as necessary throughout her recovery" with the goal of eventual "reintegration of her normal work hours and duties." It obligated Credeur to communicate regularly with her supervisor, Glen Reynaud, regarding her work product and hours and provide him with medical updates every 30 days. Credeur did not provide any medical updates until December 11, 2013.

2

No. 16-30658

In January 2014, the DOJ emailed Credeur with an "ADA Supplemental Request for Medical Status," stating that "specific measures will have to be taken to account for [Credeur's] hours worked and leave requested" and providing a certification for Credeur to fill out and submit "before the end of each pay period." In response to this request, Credeur provided the DOJ with evaluations from three different physicians, Drs. Slakey, Weitz, and Ward. The evaluations conflicted with respect to Credeur's capacity to work in the office. Both Dr. Slakey and Dr. Weitz stated that Credeur could begin working in the office—Dr. Slakey released Credeur to work up three to four hours a day and Dr. Weitz said that she could work in the office "as tolerated." Dr. Ward, on the other hand, stated that Credeur would not be able to work in the office at all for six months.

Reneé Free, the DOJ's Director of Administrative Services, emailed Credeur on February 27, 2014, seeking clarity regarding the conflicting evaluations. The email stated:

> Although the Doctor's evaluations conflict in some areas, it appears that Dr. Ward will not release you to return to the office for six months. Your initial request to work from home was granted with the specific goal of reintegration of your normal office work hours and duties. Unfortunately, it is not possible for a litigation attorney to work from home on a long term basis.
>
> Unless we receive an updated medical status evaluation from your current treating physical rehabilitation physician by Thursday, March 13, 2014, we will have no alternative but to reevaluate your employment with the Department of Justice considering your inability to perform the essential job functions of a litigation attorney.

Credeur emailed a response, explaining that the DOJ could disregard Dr. Ward's evaluation because his evaluation was "unreasonable" and she had discharged him as her doctor. She added that she received a release from her surgeon "to work part time initially and work up my endurance," which was

3

No. 16-30658

improving, and that she was "allowed to take depositions, fly for depositions and attend hearings and trials."

Free met with Credeur on March 3, 2014. Free summarized the meeting in an email, which stated that Credeur was required "to work up to 3-4 hours per day in the office (as tolerated)" and to "not work from home." Credeur was directed to complete leave slips for the remaining hours she was not able to work in the office. Credeur's supervisor, Reynaud, then reassigned some of Credeur's cases because she was having trouble keeping up with her caseload and in an effort to accommodate her reduced work schedule. Credeur's difficulty fulfilling other administrative tasks during her work-at-home accommodation was also a concern to the DOJ. Among other things, Credeur failed to complete certain safety training exercises that all DOJ attorneys were required to perform periodically.

Credeur did not return to the office until March 20, 2014, at which time the DOJ presented her with a "Last Chance Agreement" ("Last Chance Agreement" or "Agreement") to inform her of certain deficiencies in her performance and the corrective actions required of her.[1] Among other things, the Agreement cited her failure to adhere to the DOJ's office hours policy and to submit leave slips for the hours she did not work, her email correspondence reflecting "unprofessional" behavior toward her superiors, and substandard billing practices, such as block billing. The Agreement listed eight required actions, including, "You will not work from home," and "The hours you work/bill will be in the office between the hours of 8:30 am and 5:00 pm unless

---

[1] According to the deposition of Sonia Mallett, the DOJ's Director of Litigation Division, the purpose of a Last Chance Agreement is not a disciplinary action, but a device used by the DOJ to make an employee aware of performance issues so that they can be corrected. Mallett and Free testified that the DOJ has used Last Chance Agreements in the past with other employees, including attorneys.

authority is granted otherwise." The Agreement stated that the consequences of failure or refusal to comply would be cause for termination. Credeur refused to sign the Agreement, despite repeated requests from Reynaud to do so and reminders that signing was "not optional."

Credeur did not return to work. Instead, she requested and received FMLA leave.[2] On April 7, 2014, while on leave, Credeur emailed the DOJ that she had a contagious infection following a hospitalization and requested that she be able to work from home. Credeur asked to work from home, rather than remain on leave, because her files were getting behind and she needed to get them caught up. Two weeks later, the DOJ received a medical evaluation from Dr. Killackey, which stated that Credeur could not work in the office or attend court hearings, conferences, and depositions until she was cleared of infection, which would be reevaluated on May 20, 2014. The DOJ denied Credeur's request to work from home, but allowed her to take unpaid leave after her FMLA leave expired in June.

On August 12, 2014, Free sent Credeur a letter formally denying her request to work from home and explaining that DOJ litigation attorneys "cannot work from home on a long term basis" as it "places considerable strain on supervisors and staff." The letter further stated: "Considering that you are not allowed to attend hearings, conferences or depositions, we have accommodated you by reassigning cases which will require any of these activities." Finally, the letter reiterated that Credeur had failed to provide the

---

[2] Credeur disputes that she received FMLA leave and contends instead that she was placed on leave without pay ("LWOP"). Although the record is somewhat unclear, it appears that she was initially granted FMLA leave, but that the DOJ realized at some later point that she was in fact ineligible because she had not worked sufficient hours in the previous year to be entitled to it. At that point, the DOJ retroactively changed Credeur's leave status from FMLA to LWOP.

No. 16-30658

requisite medical evaluations every 30 days and requested that she submit an updated "medical excuse/evaluation" by August 26, 2014.

On August 22, 2014, Credeur provided the DOJ with a medical release to work at the office without restrictions. She returned to the office and remained employed with the DOJ until her voluntary resignation on December 31, 2014.

On August 20, 2014, two days before she returned to work, Credeur filed suit against the DOJ in Louisiana state court. The DOJ removed the case to federal court and subsequently moved for summary judgment. The district court granted summary judgment to the DOJ.[3] On Credeur's failure to accommodate claim, the district court found that Credeur was not a "qualified individual" within the meaning of the ADA because she could not perform an essential function of her job—regular attendance in the office. Alternatively, the district court held that "no reasonable juror could find that the DOJ failed to reasonably accommodate Credeur's known limitations." On Credeur's harassment claim, the district court found that the conduct complained of did not constitute harassment, or, even if such conduct was harassment, it was not sufficiently severe or pervasive to alter the terms or conditions of employment. Finally, the district court dismissed the retaliation claim because the evidence did not demonstrate that the DOJ took any adverse action against Credeur. After entry of final judgment in favor of the DOJ, Credeur timely appealed.

---

[3] Although the district court's order analyzed only Credeur's ADA claims, it also dismissed Credeur's claims dounder the LEDL, noting that the same analysis applied because Louisiana courts look to federal employment discrimination law for guidance in interpreting the State's anti-discrimination statute.

6

No. 16-30658

## II.    DISCUSSION

A. Standard of Review

We review a district court's grant of summary judgment de novo. *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Rogers v. Bromac Title Servs., LLC*, 755 F.3d 347, 350 (5th Cir. 2014). All facts and inferences are construed in the light most favorable to the nonmoving party. *Id.*

B. Failure to Accommodate Claim

"Under the ADA, it is unlawful for an employer to fail to accommodate the known limitations of an employee's disability." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011). A prima facie claim for failure to accommodate requires that: "(1) the plaintiff is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013) (emphasis omitted). There is no dispute that Credeur has a disability and that the DOJ knew of her disability and the associated limitations. At issue is whether Credeur is a "qualified" individual within the meaning of the ADA. If she is not, our inquiry ends. If she is, we must determine whether the DOJ failed to make reasonable accommodation for her disability.

To be "qualified" under the ADA, Credeur must be able to "perform the essential functions" of an attorney in the DOJ's Litigation Division "with or without reasonable accommodation." 42 U.S.C. § 12111(8). "Essential

7

functions" are "fundamental", as opposed to "marginal", job duties, 29 C.F.R. § 1630.2(n)(l), such that a job is "fundamentally alter[ed]" if an essential function is removed, 29 C.F.R. § Pt. 1630, app. at 397. "Fact-finders must determine whether a function is 'essential' on a case-by-case basis." *LHC Grp., Inc.*, 773 F.3d at 698. The text of the ADA indicates where this inquiry should begin:

> For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).

Further, the regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") list seven non-exhaustive factors to guide the essential-function inquiry:

| | |
|---|---|
| (i) | The employer's judgment as to which functions are essential; |
| (ii) | Written job descriptions prepared before advertising or interviewing applicants for the job; |
| (iii) | The amount of time spent on the job performing the function; |
| (iv) | The consequences of not requiring the incumbent to perform the function; |
| (v) | The terms of a collective bargaining agreement; |
| (vi) | The work experience of past incumbents in the job; and/or |
| (vii) | The current work experience of incumbents in similar jobs. |

29 C.F.R. § 1630.2(n)(3).

Both the statute and regulations indicate that we must give greatest weight to the "employer's judgment." It is the *only* evidence the statute requires us to consider, absent a written job description. Moreover, the EEOC explains that "the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards . . . nor to require employers to lower such standards." 29 C.F.R. § Pt. 1630,

app. at 398. The DOJ maintains that an essential function of Credeur's job as a litigation attorney is regular office attendance. Credeur disagrees. The question is whether Credeur's subjective judgment created a genuine dispute of material fact to overcome the DOJ's motion for summary judgment. On the record before us, we conclude that it did not.

As an initial matter, there is general consensus among courts, including ours, that regular work-site attendance is an essential function of most jobs. *See, e.g.*, *Hypes on Behalf of Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (per curiam) (collecting cases); *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (en banc) ("[The] general rule [is] that, with few exceptions, 'an employee who does not come to work cannot perform any of his job functions, essential or otherwise.'" (quoting *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 948 (7th Cir. 2001) (en banc))). This is especially true when the position is interactive and involves a significant degree of teamwork. *Hypes*, 134 F.3d at 727 ("[T]eam work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee's performance." (alteration in original) (quoting *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995))); *accord Ford Motor Co.*, 782 F.3d at 761 ("[M]ost jobs require the kind of teamwork, personal interaction, and supervision that simply cannot be had in a home office situation." (quoting *Rauen v. U.S. Tobacco Mfg. L.P.*, 319 F.3d 891, 896 (7th Cir. 2003))).

The EEOC's informal guidance on teleworking reinforces this point. The agency recognizes that for some jobs, the essential duties can only be performed in the workplace. Teleworking may not be feasible, for example, if the job requires "face-to-face interaction and coordination of work with other employees", "in-person interaction with outside colleagues, clients, or customers", or "immediate access to documents or other information located

only in the workplace." EEOC Fact Sheet, *Work At Home/Telework as a Reasonable Accommodation* (Oct. 27, 2005), http://www.eeoc.gov/facts/telework.html. Additionally, "the employer's ability to supervise the employee adequately" is another factor in determining whether a work-at-home accommodation is reasonable. *Id.* Direct employee supervision is easiest when the employee shows up regularly at work. It is much harder to do remotely, particularly when the employee never comes to the office at all.

Credeur, however, would have her job be the exception. By her account, she had successfully worked from home on several prior occasions before the DOJ "suddenly changed course" in early March 2014, requiring her to work part-time in the office and ordering her to do no work from home. Credeur argues that by crediting the DOJ's statements and rejecting her testimony, the district court engaged in impermissible credibility determinations and weighing of the evidence.

While we are mindful that employees can be good sources of information regarding their day-to-day activities and the prerequisites for success on the job, "[a]n employee's unsupported testimony that she could perform her job functions from home" does not create a genuine dispute of fact to preclude summary judgment. *Ford Motor Co.*, 782 F.3d at 763–64; *see also Rodriguez v. Mrs. Baird's Bakery*, 111 F.3d 893 (5th Cir. 1997) (unpublished) (rejecting notion that an employee's testimony regarding his subjective belief that discrimination occurred can without more create a genuine dispute of fact).

In *EEOC v. Ford Motor Co.*, the Sixth Circuit observed that "we do not 'allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience.'" 782 F.3d at 764. If that were not the case, "every failure-to-accommodate claim involving essential functions

10

would go to trial because all employees who *request* their employer exempt an essential function *think* they can work without that essential function." *Id.*

Furthermore, unlike the employer's judgment, which is explicitly mentioned in the statute and EEOC regulations, "[n]either the statute nor regulations nor EEOC guidance instructs courts to credit the employee's opinion about what functions are essential." *Id.* True, the regulations present a non-exhaustive list of factors to consider, but they all relate to the employer's judgment in some fashion. The first two restate the statutory considerations, which directly pertain to the employer's judgment. 29 C.F.R. § 1630.2(n)(3)(i)–(ii). The remaining five fall into the category of circumstantial evidence of an employer's policies and practices pointing to a function being essential, or not. 29 C.F.R. § 1630.2(n)(3)(iii)–(vii). The amount of time spent performing the function demonstrates whether, in practice, that function is essential to the job. The same goes for the work experience of past incumbents in the job or current incumbents in similar jobs. Evidence of the employer's stated policies can be found in the terms of a collective bargaining agreement. And the consequences of not performing the function may be severe both as a practical matter and as a matter of company policy. Principles of statutory construction suggest that the *employee*'s personal judgment, which is unlike any other item on this list, is not the kind of evidence that a court should consider. *See Magee v. Coca–Cola Refreshments USA, Inc.*, 833 F.3d 530, 534 (5th Cir. 2016) ("[T]he canon of *ejusdem generis* instructs that 'when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed.'"), *petition for cert. filed* (No. 16-668).

Of course, courts should not give blind deference to an employer's judgment, but should instead evaluate the employer's words alongside its policies and practices. *See Ford Motor Co.*, 782 F.3d at 765–66. But the evidence of the DOJ's policies and practices also point to regular work-site

attendance being an essential function of Credeur's job. The DOJ's written correspondence with Credeur prior to this litigation demonstrates a policy of requiring regular on-site attendance from litigation attorneys. For example, in a February 27, 2014 email to Credeur, the DOJ's Director of Administrative Services, Reneé Free, stated, "Unfortunately, it is not possible for a litigation attorney to work from home on a long term basis." Free reiterated the DOJ's policy in her August 12, 2014 letter, advising Credeur that "Litigation attorneys in the Attorney General's Office are not allowed to work from home except on rare occasions and only on a temporary basis."

Furthermore, the testimony of Credeur's supervisors describe the role of a medical malpractice litigation attorney as interactive and team-oriented, two factors that make it more likely that office attendance is essential to a job. Credeur's supervisor, Reynaud, said that he thought a DOJ litigation attorney could work from home for a limited amount of time, but not on a long-term basis, given the interactive nature of the position. Special Litigation Counsel David Sanders testified:

> [DOJ litigators] work as a team. A defense of a lawsuit is a team effort by the attorney, by the paralegal, by the secretary. It's bouncing ideas off our colleagues. It's discussing strategy with the Section Chief. It's writing requests for settlement authority and discussing them with all of the above.

Credeur emphasizes that Sanders also said that several responsibilities of a litigation attorney can be performed outside of the office. That fact does not negate the interactive aspects of Credeur's job. Nor does it account for the need for day-to-day coordination with supervisors and staff and for adequate supervision of Credeur's work and the hours she worked, which Reynaud testified was more difficult to accomplish when Credeur was working at home.

Credeur unilaterally declares that there were no problems resulting from her working at home and that her supervisors were always satisfied with

her work.  But the record demonstrates that her continuous absence created a strain on the office.  Even Credeur concedes that her work was getting behind.  Indeed, it was for this reason that Credeur renewed her request to work from home in April 2014.  Reynaud testified that many of Credeur's cases had pressing deadlines and required immediate attention that Credeur was unable to give.  As a result, several of her cases had to be reassigned to other attorneys.  In addition, Credeur was neglecting certain administrative tasks and failing to adequately account for her time, an issue with potentially significant repercussions for the DOJ as a public entity with fiscal accountability.

Credeur's citations to the record do not create any genuine disputes of material fact.  She singles out various statements in the depositions of DOJ personnel that she argues show inconsistency in the DOJ's practices.  But the DOJ refutes her allegations, maintaining that she either misconstrues the testimony or reads it out of context.  For example, Credeur argues that the Director of DOJ's Litigation Division, Sonia Mallett, testified that she "works from home, albeit rarely in her case."  But Mallett's main point was that she sometimes worked from home because she considers herself always to be on call, *in addition to*, not in lieu of, regular office attendance.  Credeur also contends that another civil division attorney, Billy Belsom, worked from home while his wife attended medical school in another state.  Even if that were the case, Belsom was not in the DOJ's Litigation Division and therefore is not a similarly situated comparator. *See Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) ("[W]e require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'"  This requires, among other things, that the comparator shares "the same job or responsibilities.").  The interactive aspects of Credeur's job are litigation-specific.  And Credeur

13

could not identify any other litigation attorneys that the DOJ permitted to work from home on a long-term basis.

An increasing number of employers have policies permitting telecommuting under certain circumstances. Construing the ADA to require employers to offer the option of unlimited telecommuting to a disabled employee would have a chilling effect. Rather than offer such benefits, companies would tighten their telecommuting policies to avoid liability. *See Ford Motor Co.*, 782 F.3d at 765. The ADA does not require an employer to "reallocate essential functions" to accommodate an employee with a disability. 29 C.F.R. § Pt. 1630, app. at 399. The employee must first demonstrate that she is a "qualified" individual, *i.e.*, that she can perform the essential functions of her job unaided or with the assistance of a reasonable accommodation. *Id.* Credeur has not. Therefore, the DOJ was entitled to summary judgment on her failure to accommodate claim.

C. Disability-Based Harassment Claim

Credeur claims that she was harassed on account of her disability. In *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 232–35 (5th Cir. 2001), we recognized that a plaintiff may bring a disability-based harassment claim under the ADA. To establish a prima facie case of disability-based harassment, a plaintiff must demonstrate:

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

*Id.* at 235–36 (quoting *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998) (assuming without deciding that such a cause of action exists)). Further, the "harassment must be sufficiently pervasive or severe to

alter the conditions of employment and create an abusive working environment." *Id.* at 236.  In determining whether a work environment is abusive, we consider the entirety of the evidence in the record, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)).

The district court determined that the conduct Credeur described was not harassment, and that even if such conduct was harassment, it was not sufficiently severe or pervasive to create an abusive working environment.  We agree.

Credeur claims the following conduct was harassment:  (1) being ordered to attend the meeting with Free on March 3, 2014; (2) the requirement that she work at least three to four hours in the office and to not work from home; (3) criticism of her work performance; (4) threats of termination; (5) asking her "to sign false payroll documents;" and (6) being forced to take leave without pay ("LWOP") instead of FMLA.  Credeur contends that these instances of harassment were so significant that they negatively impacted her physical and psychological health.

Considered against the record as a whole, this conduct is not the type that courts have found to constitute harassment, and certainly not harassment that is sufficiently severe or pervasive to create a hostile work environment. Criticism of an employee's work performance, such as that documented in the Last Chance Agreement, and even threats of termination do not satisfy the standard for a harassment claim.  *See, e.g.*, *Kumar v. Shinseki*, 495 F. App'x 541, 543 (5th Cir. 2012) (criticism in the workplace and threats to employee's job did not constitute actionable harassment).  Particularly where, as here, the record demonstrates deficiencies in the employee's performance that are

legitimate grounds for concern or criticism.  It is also significant that none of the DOJ's actions were "physically threatening or humiliating" or even offensive. *Flowers*, 247 F.3d at 236.  In *Flowers*, the employer's conduct toward the employee radically changed her working conditions after it was discovered that she had contracted HIV.  Her supervisor, who had been a close friend, ceased socializing with Flowers, intercepted her phone calls, and eavesdropped on her conversations. *Id.* at 236–37.  The president of the company, with whom Flowers "used to get along very well" became distant, avoided her in the workplace, and subjected her to vulgar sexual comments. *Id.* at 237.  These were humiliating and offensive *ad hominem* attacks that had no rational relation to Flowers's work performance.  The conduct Credeur identifies is not at all analogous.

Credeur also complains of the conditions that the DOJ imposed on her through the process of fashioning a reasonable accommodation for her situation.  Credeur was called into a meeting in March 2014 to discuss her ongoing absence from the office and certain actions the DOJ required of her from that point forward.  During this meeting, Credeur was told that she needed to work up to three to four hours a day in the office (as tolerated) and to not work from home.  These conditions were part of the DOJ's effort to provide Credeur with a reasonable accommodation, one that was tailored to her doctors' orders while ensuring that she could accomplish the essential functions of her job.  "The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." *Griffin*, 661 F.3d at 224.  Moreover, although the DOJ previously allowed Credeur to work from home, it always expressed the intention that the accommodation would be temporary with the goal of eventual "reintegration of her normal work hours and duties."  The DOJ was under no obligation to continue that accommodation indefinitely. *See Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759–60 (5th Cir. 1996)

No. 16-30658

("[R]easonable accommodation does not require [an employer] to wait indefinitely for [the employee's] medical conditions to be corrected." (alterations in original)); *accord Silva v. City of Hidalgo, Tex.*, 575 F. App'x 419, 423 (5th Cir. 2014).

Credeur contends that these new conditions altered the terms and conditions of her employment, including her compensation; however, the critical question is whether the altered conditions of her employment created an abusive work environment. *See Flowers*, 247 F.3d at 236. An employer's imposition of reasonable work-related conditions to ease an employee's transition back to the office after an illness does not constitute actionable harassment. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 510 (5th Cir. 2003) (employer's conditions on employee's return to work post-illness were not harassment). Furthermore, "[a] disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously." *Griffin*, 661 F.3d at 224.

Credeur's reference to being forced "to sign false payroll documents" is ostensibly based on the DOJ's request that she submit leave slips for the hours she did not work in the office, for which she was no longer compensated. Credeur asserts that she continued to do work from home, despite no longer being compensated for it. That was Credeur's choice, and not any coercive pressure from the DOJ to submit fraudulent payroll documents. Finally, as for being forced onto LWOP, this appears to have been a result of the DOJ discovering that Credeur was in fact ineligible by law to receive FMLA, although it had erroneously granted it to her. This is not harassment.

Credeur may have perceived these conditions to be onerous and may subjectively have felt singled out in being required to fulfill them. Her altered accommodation may have even negatively impacted her physical and psychological health. An employee's "subjective physical and emotional

17

reactions" to her employer's conduct, however, "do not establish that the work environment would have been perceived as hostile or abusive by a reasonable employee." *Kumar*, 495 F. App'x at 543. Credeur's attempts to manage a serious illness while maintaining her employment are admirable. But the difficulties Credeur experienced in the process do not convert her employer's actions into harassment sufficient to create a hostile work environment.

D. Retaliation Claim

Credeur also asserts that many of the above-mentioned actions were taken in retaliation for her protected activity. To prevail on a retaliation claim, Credeur must prove: (1) she engaged in an activity protected by the ADA; (2) an adverse employment action occurred; and (3) a causal connection exists between the protected act and the adverse action. *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999).

Much of the foregoing analysis regarding Credeur's allegations of harassment are equally applicable here. For example, Credeur alleges that the DOJ's criticism of her work and threats of termination for failure to comply with performance improvement expectations, in particular as conveyed in the Last Chance Agreement, were retaliatory adverse actions. Chastisement by superiors, however, "do[es] not rise to the level of material adversity" that distinguishes an adverse employment action from "'petty slights, minor annoyances, and simple lack of good manners' that the Supreme Court has recognized are not actionable retaliatory conduct." *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009) (quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Furthermore, the DOJ represents that the Last Chance Agreement is not a disciplinary action, but rather a performance improvement device intended to make an employee aware of performance issues so that they can be corrected. The record demonstrates that Credeur suffered no disciplinary actions flowing from

the Last Chance Agreement, despite refusing to sign it and abide by its terms. Nor was Credeur terminated by the DOJ. She voluntarily resigned several months after receiving the Agreement.[4]  On these facts, we cannot say the district court erred in determining that the Agreement was not the kind of materially adverse action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68.

As discussed above, the conditions that required Credeur to come into the office for three to four hours a day (as tolerated) and to not work from home were part of the reasonable accommodation the DOJ offered after it determined that Credeur's indeterminate telecommuting situation was no longer feasible. Even assuming *arguendo* that these conditions constituted adverse employment actions, there is no evidence in the record that they were retaliatory.  Instead, they were based on the medical evaluations of Credeur's treating physicians, who stated that Credeur would be able to work in the office for three to four hours a day, as tolerated.  And we understand the instruction that she not work from home to connote merely that the DOJ would no longer compensate Credeur for any work she did at home.  A reasonable accommodation may include a "part-time or modified work schedule[]," 29 C.F.R. § 1630.2(o)(2)(ii), but it does not entitle the employee to continue receiving the same compensation or benefits she was receiving without the accommodation. *Griffin*, 661 F.3d at 224.  We also do not perceive anything retaliatory about Credeur's placement on LWOP.  Although placing an employee on unpaid administrative leave may, depending on the circumstances, constitute a retaliatory adverse action, *see Stewart*, 586 F.3d at 332, there is no evidence of retaliation here.  Credeur requested the leave

---

[4] Credeur does not contend that her resignation constituted a constructive discharge.

No. 16-30658

herself and the transfer of her status from FMLA leave to LWOP was due to her ineligibility for FMLA leave.

The record simply does not support an inference that any of the DOJ's actions were taken in retaliation for Credeur's protected activity.

## III.    CONCLUSION

For the foregoing reasons, the judgment appealed is AFFIRMED.