# United States Court of Appeals
# for the Fifth Circuit

_____

United States Court of Appeals
Fifth Circuit

**FILED**

October 30, 2025

Lyle W. Cayce
Clerk

No. 24-50852

_____

Rolando Vasquez,

*Plaintiff—Appellant*,

*versus*

Union Pacific Railroad Company,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:22-CV-478

_____

Before Jones, Stewart, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

After Rolando Vasquez (Vasquez) suffered an off-duty traumatic brain injury, Union Pacific Railroad Company (UPRC) required him to undergo a fitness-for-duty evaluation and then imposed work restrictions on him. Vasquez sued for disability discrimination, and the district court granted summary judgment in UPRC's favor. We AFFIRM.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-50852

I

A

UPRC initially hired Vasquez in 2002, and in December 2016, he began working as an Electronic Technician Inspector (ETI). An ETI's essential job functions are to: "inspect and test electronic or microprocessor-based systems and components"; "troubleshoot malfunctions in electronic or microprocessor-based systems and components"; "repair, install, or dismantle electronic systems and components"; "work with tools and testing equipment"; "practice safe work habits"; and comply with UPRC's "attendance" policy. As an ETI, Vasquez also regularly drove company vehicles.

On June 8, 2019, Vasquez was involved in an off-duty motorcycle accident. He suffered a traumatic brain injury (TBI), a subdural hematoma, a laceration to his spleen, multiple fractures, and friction burns. Vasquez was hospitalized for 13 days, during which he underwent a splenectomy and was prophylactically prescribed a seven-day course of anti-seizure medication.[1] He was discharged on June 21, 2019.

On July 1, 2019, Vasquez had a follow-up visit, which primarily concerned his splenectomy, with nurse practitioner Jeni Wilson (Wilson). Wilson cleared Vasquez to return to work without restrictions, effective July 29, 2019. Wilson was not familiar with Vasquez's duties as an ETI.

Under UPRC's medical rules, Vasquez's injuries qualified as a "reportable health event" that required him to undergo a fitness-for-duty (FFD) evaluation before he could return to work. The purpose of an FFD evaluation is to determine whether an employee is "medically and

---

[1] Vasquez has never actually had a seizure.

2

functionally able to safely perform his/her job." During the FFD evaluation period, Vasquez remained on unpaid leave.

UPRC's FFD evaluations are largely guided by the Federal Motor Carrier Safety Administration's (FMCSA) Medical Examiner Handbook, which was created for commercial drivers—not railroad workers. The handbook states that "[c]ortical and subcortical hemorrhages are associated with an increased risk for seizures" and recommends a five-year waiting period for those at risk for seizures. The FMCSA removed the handbook from its website in 2015 because medical professionals were confusing the handbook's *guidelines* as *regulations*, and because the FMCSA wanted to update certain information.

Consistent with FMCSA guidance, UPRC's Medical Standards for Safety Critical Workers impose a five-year minimum waiting period for employees that have experienced subarachnoid hemorrhages without related seizures. For those who have experienced a mild TBI without related seizures, UPRC's medical standards impose a one-year waiting period, whereas a moderate TBI without related seizures calls for a two-year waiting period.

On July 31, 2019, a UPRC Associate Medical Director, Dr. John Charbonneau (Dr. Charbonneau), reviewed Vasquez's case and determined that, although there was "no indication" Vasquez had a seizure, he had suffered a "mild-moderate TBI"[2] and a subarachnoid hemorrhage. These diagnoses carried two- and five-year waiting times, respectively. In his initial report, Dr. Charbonneau also requested additional medical records. He then created a follow-up report on August 12, 2019, concluding that Vasquez's TBI was "at least moderate" and again noting Vasquez had suffered a

_____

[2] Vasquez's own medical records labeled his TBI only as "mild."

subarachnoid hemorrhage. Both conditions, according to Dr. Charbonneau, mandated a five-year waiting period and numerous work restrictions. Though Dr. Charbonneau reviewed Vasquez's records, he did not physically examine Vasquez or speak to his doctors.

On February 10, 2020, another UPRC Associate Medical Director, Dr. Matthew Hughes (Dr. Hughes), reviewed Vasquez's case and noted that Vasquez's recent "neurocognitive testing . . . revealed mild []difficulties with mild delayed visual memory" that was "unlikely [to] result in any significant safety []risk." Dr. Hughes still determined UPRC would "need a neuro file review" to determine Vasquez's risk for sudden incapacitation given his "significant [TBI]."

UPRC referred Vasquez's case to Dr. T. Scott Diesing (Dr. Diesing), a neurologist at the University of Nebraska, for review under FMCSA guidance. Dr. Diesing concluded that, "[b]ased on the FMCSA [FFD] guidance documents," Vasquez was at "moderate to high risk for future sudden incapacitation," and "FMCSA guidance documents recommend [five] years of work restrictions." Dr. Diesing did not physically examine Vasquez or speak to his treating medical providers.

On April 11, 2020, UPRC's Chief Medical Officer, Dr. Laura Gillis (Dr. Gillis), issued a final FFD determination after reviewing Vasquez's file and medical records. She concluded that "[b]ased upon [his] [TBI] and subarachnoid hemorrhage location," Vasquez was "at an increased risk for sudden incapacitation from seizures" and "require[d] certain work restrictions to [e]nsure [his] safety and the safety of those around [him]." Dr. Gillis imposed the following work restrictions, which were to remain in place for at least five years: (1) "[n]o operating company vehicles, on-track or mobile equipment, or fork-lifts"; (2) "[n]o work on or near moving trains, freight cars or locomotives, unless protected by barriers"; (3) "[n]o

operating cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee"; (4) "[n]o work at unprotected heights, over 4 feet above the ground"; and (5) "[n]o working on 1-man or 2-man gangs (i.e., switch oiler, inspector, welder or helper job, 2-man section gang)." Vasquez would be eligible for reconsideration of his restrictions in June 2024.

On July 24, 2020, UPRC informed Vasquez that his restrictions could not be accommodated in his position as an ETI. In August of 2020, Vasquez communicated with Pauline Weatherford (Weatherford), a UPRC vocational manager, regarding an alternative position on a signal construction gang. On September 15, 2020, UPRC informed Vasquez he could not be accommodated in a signal construction job due to his driving restrictions. The same day, Vasquez informed UPRC he had a job offer with another company and indicated that "internal placement" was "unlikely to be needed." On October 29, 2020, Vasquez told Weatherford he had found another position outside UPRC and was "happy" with that placement but planned to return to UPRC when eligible for review of his restrictions.

In January 2021, Vasquez contacted Weatherford and stated he wanted to continue looking for another position at UPRC because his "external" position had "closed" due to the COVID-19 pandemic. Vasquez specifically inquired about clerk and manager positions. Weatherford told Vasquez that his work restrictions could not be accommodated for the clerk position. For the manager position, his driving work restriction could pose an issue, but Weatherford said she would follow up with him "in a few days." Vasquez claims he was never given a definitive answer regarding the manager position.

No. 24-50852

B

On May 13, 2022, Vasquez sued UPRC under the ADA, alleging disparate treatment and failure to accommodate.[3] Vasquez moved for summary judgment on his disparate treatment claim, arguing that he had established discrimination through direct evidence. UPRC moved for summary judgment on both of Vasquez's claims, arguing that Vasquez had not shown direct or indirect evidence of disability discrimination and asserting the direct threat defense to his disparate treatment claim. UPRC also argued that Vasquez failed to establish a prima facie case on his failure-to-accommodate claim.

A magistrate judge recommended that summary judgment be granted in favor of UPRC on both of Vasquez's claims. Because he found that UPRC had established its direct threat defense as a matter of law, the magistrate judge declined to address whether Vasquez's disparate treatment claim should be resolved under the direct or indirect evidence framework. The magistrate judge also concluded that Vasquez had failed to establish a prima facie case on his failure-to-accommodate claim. Over Vasquez's objections, the district court adopted the magistrate judge's recommendation, granted UPRC's motion for summary judgment, and denied Vasquez's motion for summary judgment. Vasquez appeals.

II

We review the grant of summary judgment de novo and apply the same standards used in the district court. *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant

_____

[3] Vasquez also raised, but voluntarily dismissed, an ADA disparate impact claim.

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute as to a material fact exists when, after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, a court determines that the evidence is such that a reasonable jury could return a verdict for the party opposing the motion." *Haverda v. Hays County*, 723 F.3d 586, 591 (5th Cir. 2013). This court "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]o avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007).

## III

Vasquez appeals the summary judgment in UPRC's favor on his disparate treatment claim, arguing that the district court erred by concluding that he had not presented direct evidence of discrimination and by impermissibly placing the burden to prove UPRC's direct threat defense on him. He also contends that there are several genuine factual disputes regarding UPRC's entitlement to the defense. UPRC responds that it "satisfied the necessary criteria to prove that because Vasquez could not safely perform his essential job function[s,] he was not qualified under the ADA."

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prevail on an ADA disparate treatment claim, a plaintiff must show: "(1) he has a disability or was

regarded as disabled; (2) he was qualified for the job; and (3) he was subject to an adverse employment decision because of his disability." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 341 (5th Cir. 2019).

"In employment discrimination cases, a plaintiff may present his case by direct or circumstantial evidence, or both." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002). "If the plaintiff produces direct evidence that discriminatory animus played a role in the employer's adverse employment decision, the burden of persuasion shifts to the defendant who must prove that it would have taken the same action despite any discriminatory animus." *Nall*, 917 F.3d at 340. But "[i]f the plaintiff only produces circumstantial evidence of discrimination, the well-known burden-shifting analysis set forth in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)], guides our inquiry." *Id.*

Even where an employee establishes evidence of discrimination, the ADA allows employers to raise a "direct threat" defense. *See E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 731 (5th Cir. 2007) ("The ADA does not protect an employee who poses a direct threat to the health and safety of herself or others in the workplace."); *Carrillo v. Union Pac. R.R. Co.*, No. 22-50782, 2024 WL 3861374, at *3 (5th Cir. Aug. 19, 2024) (unpublished) ("But even if an employee provides such evidence [of discrimination], the ADA allows employers to defend a charge of discrimination by raising a direct threat defense."); 42 U.S.C. § 12113(a)–(b). To qualify as a "direct threat," an employee must pose "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3); *see also Nall*, 917 F.3d at 342.

"The employer must make an 'individualized assessment of the individual's present ability to safely perform the essential function of the job.'" *E.I. Du Pont*, 480 F.3d at 731 (quoting *Chevron U.S.A. Inc. v.*

*Echazabal*, 536 U.S. 73, 86 (2002)). In making this individualized assessment, employers should consider "(1) the duration of the risk, (2) the nature and severity of potential harm, (3) the likelihood that potential harm will occur, and (4) the imminence of potential harm." *Carrillo*, 2024 WL 3861374, at *3; *see also* 29 C.F.R. § 1630.2(r). "Whether an employer has properly determined that a person poses a direct threat depends on 'the objective reasonableness of [the employer's] actions.'" *Nall*, 917 F.3d at 342 (quoting *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998)). "The direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence.'" *Echazabal*, 536 U.S. at 86 (quoting 29 C.F.R. § 1630.2(r)).

As an initial matter, we need not address whether the district court erred in finding Vasquez failed to present direct evidence of discrimination. Although the district court ultimately concluded that it did "not need to reach the [direct evidence] issue" because UPRC had established its direct threat defense as matter of law, it nevertheless stated that *if* it had to decide the issue, it would find that Vasquez had not established direct evidence of discrimination. We also find that UPRC satisfied its burden to demonstrate the absence of a genuine factual dispute as to its direct threat defense.

Nor do we need to address whether the district court impermissibly placed the burden to prove UPRC's direct threat defense on Vasquez. As the district court acknowledged, we have yet to weigh in on the circuit split regarding which party bears the burden of proof when an employer cites safety concerns in connection with an adverse employment decision. *See Nall*, 917 F.3d at 343 n.5; *Branham v. Snow*, 392 F.3d 896, 906 n.5 (7th Cir. 2004) (observing the split). As a result, the district court examined the direct threat issue by placing the burden on *both* Vasquez to show that he was qualified for the job in question *and* on UPRC to establish the direct threat issue as an affirmative defense. Ultimately, the district court concluded that

No. 24-50852

UPRC had established, as a matter of law, the objective reasonableness of its decision that Vasquez posed a direct threat.

That leaves only Vasquez's final argument that genuine issues of material fact preclude summary judgment on UPRC's direct threat defense for determination.

## A

Vasquez first argues there is a genuine factual dispute as to whether UPRC conducted an individualized assessment. We disagree.

UPRC's evidence shows that four doctors assessed Vasquez's case during the FFD process. Together, they reviewed all the records Vasquez submitted, requested additional records, referred Vasquez's case to an independent neurologist, and conducted multiple rounds of evaluations. Based on the doctors' reports, UPRC issued five-year work restrictions that—although standardized to a certain degree—were premised on Vasquez's personal risk assessment results. Vasquez's supervisor then determined that those restrictions could not be accommodated in his position as an ETI given the role's essential job functions. "It is unclear what more [Vasquez] would have [UPRC] do to individualize its evaluations."[4] *See Carrillo*, 2024 WL 3861374, at *4 (holding that UPRC, in using a process similar to the one deployed here, conducted an individualized evaluation of the plaintiff's ability to perform his essential job functions).

---

[4] Though Vasquez complains that UPRC's doctors did not physically examine him or directly contact his medical providers, "none of our direct threat precedents require that an employer have its own doctors meet with or examine an employee before taking appropriate action." *Carrillo*, 2024 WL 3861374, at *4 n.2.

B

Vasquez next argues that a fact issue exists because UPRC did not make a reasonable medical judgment based on the best available objective evidence for three reasons: (1) UPRC's FFD process largely relied on the FMCSA handbook, (2) Vasquez's treating medical providers cleared him to work, and (3) he presented expert testimony finding "[t]here is no justifiable reason [he] should not have been returned to full duty by 07/29/2019." We disagree.

In *Carrillo*, the plaintiff challenged UPRC's use of FMCSA guidance in a nearly identical case. 2024 WL 3861374, at *5. This court found it did not matter that UPRC "looked partly to guidance documents from the [FMCSA] that were not peer-reviewed and were removed from the FMCSA website" because "[i]t is undisputed on this record that the guidance documents were evidence-based and developed through a consensus of medical experts." *Id.* The same is true here. And like the plaintiff in *Carrillo*, Vasquez "does not identify medical literature missing from [UPRC's] consideration." *See id.* Although Vasquez presented testimony from one expert suggesting it was "inappropriate[]" to rely on the FMCSA guidance, "that alone is insufficient to prohibit [UPRC] from consulting them as part of its FFD program." *See id.* (finding UPRC could consult FMCSA guidance where the plaintiff "point[ed] to one email from one doctor who opined that the guidance documents are not reliable"). Nor is UPRC "prohibited from consulting the guidance documents simply because they were created for vehicle carriers." *See id.* UPRC's use of the FMCSA handbook in its FFD process does not render that process unreasonable.

Vasquez's arguments concerning other medical providers' opinions that he could return to work are similarly unpersuasive. These medical

providers were not familiar with his essential job functions. And "a correct conclusion is not required to satisfy the objective reasonableness standard." *Nall*, 917 F.3d at 346 n.8; *see also Carrillo*, 2024 WL 3861374, at *3 ("The direct threat defense protects the employer even if the employer does not reach the correct diagnosis.").

C

Finally, Vasquez argues that his medical records establish a genuine issue of material fact as to whether he posed a significant risk of substantial harm. Again, we disagree.

The pertinent question is "whether there is any evidence in the record that creates a genuine issue of material fact as to whether [UPRC] meaningfully assessed [Vasquez's] ability to perform his job safely and reasonably concluded that he posed a direct threat." *See Nall*, 917 F.3d at 344. As noted in the final FFD determination letter, UPRC looked to FMCSA guidance and determined that Vasquez's "[TBI] and subarachnoid hemorrhage location" placed him "at an increased risk for sudden incapacitation from seizures." It points to FMCSA guidance suggesting that this increased seizure risk calls for a five-year waiting period. As an ETI, Vasquez had to work around high voltage equipment, work while moving trains passed by, work at unprotected heights, and often drove company vehicles. Given these requirements, Vasquez and those around him "would be significantly endangered if he suddenly lost consciousness." *See Carrillo*, 2024 WL 3861374, at *4. The record demonstrates that UPRC appropriately considered the duration of the risk, the nature and severity of potential harm, the likelihood of potential harm, and the imminence of potential harm, and reasonably concluded Vasquez posed a significant risk of substantial harm.

The district court did not err in granting summary judgment on Vasquez's disparate treatment claim.

IV

Vasquez also argues that the district court erroneously granted summary judgment on his failure-to-accommodate claim because he was qualified for his position as an ETI as well as for alternative existing positions, i.e., the signal construction, clerk, and manager positions. UPRC responds that Vasquez was not "qualified" to work as an ETI and that he did not carry his burden of proving an available position existed for which he was qualified.

To prevail on a failure-to-accommodate claim under the ADA, a plaintiff must prove: "(1) the plaintiff is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Feist v. La., Dep't of Just.*, 730 F.3d 450, 452 (5th Cir. 2013). "To be 'qualified' under the ADA, [the plaintiff] must be able to 'perform the essential functions'" of the job at issue. *Credeur v. La. Through Off. of Att'y Gen.*, 860 F.3d 785, 792 (5th Cir. 2017) (quoting 42 U.S.C. § 12111(8)). An employer is not required "to 'reallocate essential functions' to accommodate an employee with a disability." *Id.* at 795 (quoting 29 C.F.R. § Pt. 1630, app. at 399).

"[W]e have held that ADA compliance requires an employer to engage in an interactive process with an employee who requests an accommodation for her disability to ascertain what changes could allow her to continue working." *Dillard v. City of Austin*, 837 F.3d 557, 562 (5th Cir. 2016). The interactive process "should be an ongoing, reciprocal process, not one that ends with 'the first attempt at accommodation,' but one that 'continues when the employee asks for a different accommodation or where

the employer is aware that the initial accommodation is failing and further accommodation is needed.'" *Id.* at 562–63 (quoting *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001)). "[R]eassignment to a different job may be a reasonable accommodation, but '[t]he plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform.'" *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017) (quoting *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007)).

UPRC's evidence shows that Vasquez's five-year work restrictions could not be accommodated in his ETI position because the job required him to drive company vehicles and work on a "one-man gang." He also could not be accommodated in a signal construction position due to his driving restrictions. Because Vasquez failed to "demonstrate that [he] is a 'qualified' individual, i.e., that [he] can perform the essential functions" of the ETI and signal construction positions "unaided or with the assistance of a reasonable accommodation," the district court did not err by granting summary judgment on his failure-to-accommodate claim to the extent it was premised on these positions. *See Credeur*, 860 F.3d at 795.

As for the clerk position, the district court cited Vasquez's testimony that he was not looking at specific available positions and concluded this testimony was "fatal" to Vasquez's failure-to-accommodate claim because he has the burden of proving an available position exists for which he is qualified. In his deposition, Vasquez stated there was no "particular" clerk job that was available, and he had instead been "generally talking" with Weatherford "about different types of jobs at [UPRC] that [he] could possibly work at." Although Vasquez points to a single email to Weatherford asking about the status on a "[c]lerk position in San Antonio," this is not sufficient to create a genuine factual dispute as to whether a particular

available clerk position existed. Vasquez also points to no evidence that he was *qualified* for that position. *See Moss*, 851 F.3d at 418.

As for the manager position, the district court again concluded that Vasquez failed to show an available position because he testified "he was not talking about 'particular' positions but merely 'generally talking about different types of jobs.'" But the testimony cited by the district court was only in reference to a clerk position, not a manager position. Vasquez testified that he looked at UPRC's career website and identified specific manager jobs in San Antonio and El Paso. He then sent the posting for the San Antonio manager position to Weatherford, which creates a factual dispute regarding whether there was an available manager position.

Nevertheless, "we may affirm summary judgment on any basis supported by the record even if not reached by the district court." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 995 F.3d 384, 388 (5th Cir. 2021). Vasquez bears the burden to show that the manager position was available *and* that he "was qualified for and could, with reasonable accommodations, perform" that job. *See Jenkins*, 487 F.3d at 315. Vasquez has failed to point to any evidence showing he was qualified for the manager position at the time he inquired about it with Weatherford.[5] The only relevant evidence suggests

---

[5] Vasquez only points to testimony regarding his performance in a *prior* signal maintenance manager position. This evidence does not create a factual dispute regarding whether Vasquez was qualified for the manager position *at the time* he sought reassignment. *See Moss*, 851 F.3d at 418 ("We do not question whether [the plaintiff] was qualified for his job prior to taking leave, instead the question is whether he was qualified at the time of his termination.").

No. 24-50852

Vasquez was not qualified for the manager position due to his driving restrictions.[6]

The district court did not err in granting summary judgment on Vasquez's failure-to-accommodate claim.

AFFIRMED.

---

[6] We also note that the record indicates that Vasquez started a job at a different company several months before he inquired about the clerk and manager positions. It was only *after* Vasquez lost this "external" job due to the COVID-19 pandemic that he reached out to UPRC about other possible accommodations. "At summary judgment, an employee's unilateral withdrawal from the interactive process is fatal to her claim, so long as the employer engaged in a good-faith, interactive process with the employee regarding her request for a reasonable accommodation." *Equal Emp. Opportunity Comm'n v. Methodist Hosps. of Dallas*, 62 F.4th 938, 950–51 (5th Cir. 2023) (citation modified). The parties do not address whether Vasquez's new employment with a different company cut off the interactive process or otherwise impacted UPRC's duty to continue in that interactive process as it relates to the clerk and manager positions. Because the issue is not raised by the parties, we do not address it.