**REVISED March 10, 2020**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-11613

United States Court of Appeals
Fifth Circuit

**FILED**

January 14, 2020

Lyle W. Cayce
Clerk

GEORGE CHARLES CLARK,

> Plaintiff–Appellant,

v.

CHAMPION NATIONAL SECURITY, INCORPORATED,

> Defendant–Appellee.

Appeal from the United States District Court
for the Northern District of Texas

ON PETITION FOR REHEARING AND REHEARING EN BANC

Before ELROD, WILLETT, and OLDHAM, Circuit Judges.

DON R. WILLETT, Circuit Judge:

The petition for rehearing is DENIED and no member of this panel nor judge in active service having requested that the court be polled on rehearing en banc, the petition for rehearing en banc is also DENIED. The following is substituted in place of our opinion.

In this workplace-discrimination appeal, Charles Clark says he was fired because of a diabetes-related condition. His employer, Champion National Security, Inc., offers a simpler explanation: Clark was sleeping at his desk

No. 18-11613

during work hours, an immediately terminable offense. The district court granted Champion's motion for summary judgment. We affirm.

## I. BACKGROUND

Champion provides uniformed security services to other companies. In October 2015, Champion hired Clark as a Personnel Manager.[1] In this position, Clark was responsible for human resources and employee-related issues at his branch.[2] His duties included interviewing, hiring, training, disciplining, and terminating security guards. For example, Clark "trained security guards and gave guidance about Champion's policies, including the alertness policy." He also "participated in the process of terminating Champion employees that [sic] appeared to be asleep at work."[3] As such, Champion maintains that it was particularly important "for Clark to set a good example [for] guards and staff by being alert at work." Generally, it's important to Champion that "managers who are enforcing policy are also compliant with those same policies."

According to Clark, he suffered from multiple physical and mental ailments prior to and during his employment at Champion.[4] Most relevant to

---

[1] At that time, Champion had four regions—all of which reported to one corporate office. Clark worked as the Personnel Manager for the Arlington, Texas branch in the South Central region.

[2] Champion's Corporate Human Resources Manager, Jeff Mays, determined the job functions of the regional personnel managers, like Clark.

[3] According to Champion management, the termination "process typically involves taking a photograph of the employee, obtaining witness statements, and terminating their employment immediately (*i.e.*, certainly before they do any further work)."

[4] Clark claims that he has suffered from several mental disorders, such as Post-Traumatic Stress Disorder, Major Depressive Disorder, Attention-Deficit/Hyperactivity Disorder, "depression, psychotic," and Generalized Anxiety Disorder. Clark also claims that he has suffered from physical ailments like arthritis. But there is no evidence that Clark alerted Champion about these mental or physical conditions, and he doesn't claim that they impacted his employment, so they don't affect this dispute.

2

this case, Clark has been an insulin-dependent Type II diabetic for over a decade. Clark requested two accommodations for his diabetes, which Champion granted: First, he requested a refrigerator in his office in which to store insulin. Second, Clark requested flexibility to leave work to attend doctor appointments. Champion provided these accommodations throughout Clark's tenure at the company. And Clark didn't request any other accommodations related to his diabetes.

But Clark did request exceptions to Champion policies. Due to the nature of its customer-facing and public-facing business, Champion requires officers and staff to adhere to specific dress and grooming requirements. Notably, Champion requires employees to be clean-shaven and wear dress shirts tucked into their pants.[5] But Clark wanted to "grow [a] small beard." He believed Champion should have granted this request because he interacted with fellow employees, not clients. Champion denied Clark's request.

About three months later, Clark renewed his request. This time, Clark framed his request as one based upon his diabetes.[6] He submitted a note from his general practitioner. But the note merely stated, "[p]lease excuse [Clark] from the shaving requirement as he has eczema and dry skin." Clark does not assert that eczema or dry skin is a disability. Champion assented to Clark's request based on this doctor's note. But Bill McCoy, Champion's then-Senior

---

[5] The grooming policy requires male employees "to maintain a clean shaven appearance. No beards, long sideburns (below ear), or goatees. *Exceptions*: . . . beard for medical need (provide proof to Human Resources)." "All officers are expected to tuck in their uniform shirt at all times."

[6] Clark's email to Champion said, "Diabetics face a variety of potential skin problems. Those with diabetes are at an increased risk for bacterial or fungal skin infection." His email then went on to describe folliculitis and ways to manage it—including "reduc[ing] frequency of shaving (or grow a beard)." But Clark admitted in his deposition that he had never been diagnosed with folliculitis. Another email of Clark's asserts that "[t]he medical note that I provided to Matt for my facial hair exemption is for a medical issue that is a result of my diabetes. I have been an insulin-dependent diabetic for eight years."

No. 18-11613

Vice President, offered Clark an extra fifty cents per hour for complying with the shaving policy. Clark rejected the offer.

Around the same time, Clark also requested an exception to Champion's dress code. Clark had recently undergone shoulder surgery. So he requested an accommodation permitting him to leave his shirt untucked during his recovery. In support of this request, Clark submitted a note from his doctor. The note prohibited "manipulation of the left arm until released by the surgeon." Because the note did not state that he was unable to tuck in his shirt, Champion initially denied Clark's request, thinking that he could tuck in his shirt without using his left arm. Clark submitted additional documentation from his doctor, but it still didn't explicitly say that he was unable to tuck in his shirt.[7] McCoy told Clark that Champion did not believe his request to leave his shirt untucked was reasonable.

After Clark exchanged a series of emails about his dress and grooming requests with McCoy, Clark asserted that McCoy was harassing him on the basis of disability. So McCoy referred Clark to Jeff Mays, Champion's Corporate Human Resources Director.[8] Clark submitted a formal complaint to Mays in April 2016.[9] And Mays investigated the allegations. Mays concluded that McCoy did not harass Clark on the basis of disability. Mays shared these

---

[7] Clark subsequently submitted a note from his doctor that stated, "Clark should not be performing any activity that affects the left shoulder cuff and causes pain, including reaching behind his back."

[8] McCoy's email to Clark stated, "I have copied in the HR manager [Mays] so that he can obtain your formal complaint and begin an investigation."

[9] In this complaint, Clark alleges that McCoy was harassing him by: requiring multiple notes from Clark's doctors to justify his need for accommodations under the dress and grooming policy, sending emails that were "unprofessional" and "mocking," and denying him a fifty-cent raise on the basis of disability. We think Clark mischaracterizes both the tone of the emails and McCoy's offer to pay Clark an additional fifty cents per hour (he had already received a 4% raise) to incentivize him to shave in compliance with its grooming policy.

4

findings with both McCoy and Clark—though Clark rejected the legitimacy of the investigation.[10]

Let's fast forward to August 2016. A Champion employee told Paul Bents, Clark's manager, that "Clark was closing his office door for long periods of time" and she "could often hear him snoring."[11] The following month, Bents received a picture anonymously by text message. This picture appeared to show Clark asleep at his desk at work. "Lack of alertness" at work—which includes "sleeping or giving the appearance of sleeping"—is an immediately terminable offense at Champion.[12] But Champion did not terminate Clark at this time. Champion explained that using an anonymous picture as sole proof would have deviated from its usual process of terminating a non-alert employee, which includes collecting two witness statements. Plus, the supposed violation of the alertness policy was not properly documented. So Champion took no action against Clark.

But December 7, 2017 was a different story. On that morning, another employee told Bents that it appeared Clark was sleeping at his desk during work hours. So Bents went to Clark's office and took a picture of him around 8:30am. Both Bents and the reporting employee stated that they heard Clark breathing. Bents immediately sent to corporate management the picture of

---

[10] At the time of the investigation, Mays reported to McCoy. So Clark argues that the investigation lacked fairness and impartiality.

[11] Bents circulated a "general reminder email to all office staff reiterating [Champion's] open door policy." Clark contested the policy, and Bents provided him with a copy of it.

[12] Champion's Handbook lists terminable offenses, including "[f]ailure to maintain alertness: . . . sleeping or giving the appearance of sleeping at any time while on duty or on the client's property (including breaks) is considered a terminable offense."

## No. 18-11613

Clark sleeping and employee statements corroborating the event.[13] A few minutes later, Clark awoke on his own. Champion asserts that Clark did not appear to be in physical distress. And Clark does not provide evidence otherwise. Bents explained to Clark that at least two people saw him sleeping. Clark told Bents that he didn't remember getting up that morning or driving to work, but woke up at his desk. Clark also told Bents that he might have been experiencing a diabetic emergency, and that he was going to the hospital. Then Clark left the office.

While at the emergency room, he received a call from Mays. Mays terminated Clark for violating the alertness policy. Clark insisted that he wasn't sleeping; he said he passed out from low blood sugar. But Mays simply wished him well in future endeavors.

Clark contends that Champion fired him because of a condition resulting from his disability.[14] So Clark sued Champion, alleging violations of the Americans with Disabilities Act[15] and the Texas Labor Code.[16] Specifically,

---

[13] Specifically, Bents sent the picture to Mays (Corporate Human Resources Manager), McCoy (then-Senior Vice President), and Matt Sullivan (then-Director of Field Operations, and the individual to whom Bents reported).

[14] Clark claims that he suffered temporary amnesia and lost consciousness due to complications of his Type II diabetes.

[15] Congress amended the Americans with Disabilities Act in 2008, and the amended version became effective on January 1, 2009. The amendment "rejected what Congress perceived to be the Supreme Court's unduly restrictive approach to analyzing whether [an individual] suffered from a 'disability' for purposes of the ADA." *Patton v. eCardio Diagnostic LLC*, 793 F. Supp. 2d 964, 968 (S.D. Tex. 2011) (alteration in original) (internal quotation marks omitted). So Congress expanded the definition of "disability" and instructed courts to construe that definition "broadly." *Id.*; *see also* 42 U.S.C. § 12102. Here, Clark has asserted that diabetes is the only disability upon which he bases his claims. And Champion does not contest that diabetes is a qualifying disability. So the amendments will not play a major role in this case. Although the amended version is known as the "ADAAA," for consistency and convenience, we use "ADA" throughout.

[16] Clark's claims under the Texas Labor Code are based on the Texas Commission on Human Rights Act (TCHRA). "Because TCHRA 'parallels the language of the [ADA]', Texas courts follow ADA law in evaluating TCHRA discrimination claims. *E.g.*, *Pegram v.*

No. 18-11613

Clark alleges discrimination and harassment on the basis of disability, retaliation, failure to accommodate a disability, and failure to engage in the interactive process under both the ADA and TCHRA. Accordingly, he claims entitlement to myriad damages and fees pursuant to state and federal law.

Both parties filed motions for summary judgment. The district court granted Champion's motion, dismissing all of Clark's claims. Clark timely appealed.

## II. STANDARD OF REVIEW

"We review a district court's summary judgment *de novo,* applying the same standard as the district court."[17] Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[18] "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[19] "When considering a motion for summary judgment, the court views all facts and evidence in the light most favorable to the non-moving party."[20] "Mere conclusory allegations are insufficient to defeat summary judgment."[21]

---

*Honeywell, Inc.*, 361 F.3d 272, 285–87 (5th Cir. 2004). The following ADA analysis therefore applies equally to the TCHRA." *Williams v. Tarrant Cty. Coll. Dist.*, 717 F. App'x 440, 444–45 (5th Cir. 2018).

[17] *Tagore v. United States*, 735 F.3d 324, 327 (5th Cir. 2013).

[18] FED. R. CIV. P. 56.

[19] *Tagore*, 735 F.3d at 328 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[20] *Howell v. Town of Ball*, 827 F.3d 515, 522 (5th Cir. 2016).

[21] *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010).

No. 18-11613

## III. DISCUSSION

### A.    Direct Evidence of Disability Discrimination

Title II of the ADA prohibits an employer from discriminating against an employee who is a qualified individual with a disability on the basis of that disability.[22] "In a discriminatory-termination action under the ADA, the employee may either present direct evidence that [he] was discriminated against because of [his] disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas*."[23]

Clark argues that he presented direct evidence of discrimination based on disability. But the district court disagreed. The district court determined that Clark would be unable to establish a claim for disability discrimination through direct evidence, and that "the evidence proffered fails to establish that [Champion] relied upon any forbidden factor in making the ultimate decision to fire [Clark]." Clark believes this finding was in error. The district court did not explain its conclusion. But we agree with it.

"[D]irect evidence is rare."[24] And this is not one of those rare cases. We have defined "direct evidence" as "evidence which, if believed, proves the fact without inference or presumption."[25] "A statement or document which shows 'on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action [is] direct evidence of discrimination.'"[26] Clark's case for direct evidence of discrimination boils

---

[22] 42 U.S.C. § 12112(a).

[23] *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). See infra Part III.B for a discussion of the *McDonnell Douglas* burden-shifting analysis.

[24] *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994).

[25] *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993).

[26] *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018) (quoting *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005)).

down to the following assertions: (1) Bents, Mays, and Vice President McCoy knew Clark had diabetes and believed it to be a condition that constitutes a disability; (2) Bents, Clark's supervisor, stated that Clark "may have" informed him about previous problems with his insulin levels; (3) upon learning that co-workers discovered Clark not awake at his desk during work hours, McCoy responded, "perfect. . . . let him go"; and (4) after awakening, Clark told Bents that he was going to the hospital, but neither Bents nor anyone else attempted to determine whether there was a medical reason for Clark's conduct.

This evidence is a far cry from what we have previously found to be direct evidence of discrimination. For example, in *Portis*, a demoted bank employee alleging sex discrimination in violation of Title VII provided evidence of multiple occasions where her supervisor told her that she "wouldn't be worth as much as the men would be to the bank" and "she would be paid less *because she was a woman*."[27] We held that no inference was required to conclude that the employee was treated differently because of her sex, meaning her supervisor's statements constituted direct evidence of discrimination.[28]

There was also direct evidence of discrimination in *Etienne*, where a casino's former employee, an African-American woman, alleged that she was not promoted to a managerial position due to her race in violation of Title VII.[29] We held that statements made "on several occasions" by the general manager—who was responsible for filling the position—that he did not allow "dark skin black person[s to] handle any money at" the casino and that he

[27] *Portis*, 34 F.3d at 329.

[28] *Id.* at 329–31.

[29] *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 474 (5th Cir. 2015).

"thought [the employee] was too black to do various tasks at the casino" constituted direct evidence of discrimination.[30]

Direct evidence was also present in our 2005 *Jones* case. There, an African-American applicant wasn't hired for any of a casino's vacant poker dealer positions and sued the owner under Title VII for race discrimination.[31] The applicant presented evidence that the casino's poker room manager—who was responsible for hiring—regularly used racially derogatory language and stated that "the[y] were not going to hire a black person unless there were extenuating circumstances."[32] Further, the applicant presented evidence that the same manager told his assistant that "good old white boys don't want blacks touching their cards in their face" and said to a former employee "maybe I've been told not to hire too many blacks in the poker room."[33] The court held that these statements were direct evidence of discrimination.[34]

Our 2006 decision in *Rodriguez* is also instructive. "This case is one of those rare ADA cases in which we are presented with *direct* (rather than circumstantial) evidence of discriminatory intent: ConAgra and Ms. Zamora have both *admitted* that Rodriguez did not get his job because of his allegedly uncontrolled diabetes."[35] "In its appellate brief, ConAgra twice *concedes* (albeit

---

[30] *Id.* at 476.

[31] *Jones*, 427 F.3d at 991.

[32] *Id.* at 993.

[33] *Id.*

[34] *Id.* Although in *Portis*, *Etienne*, and *Jones* we analyzed allegations of direct evidence of discrimination in the context of Title VII, the principle of what qualifies as direct evidence is persuasive in the context of the ADA—a sister antidiscrimination statute. *See, e.g.*, *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 765 (5th Cir. 2016) (citing discrimination cases under Title VII and the Age Discrimination in Employment Act of 1967 in its analysis of whether a former employee presented direct evidence of disability discrimination under the ADA).

[35] *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 480 (5th Cir. 2006).

coupled with an irrelevant caveat) that it withdrew Rodriguez's job offer because it regarded him as substantially limited by his diabetes in the major life activity of working."[36]

In this case, Champion's brief makes no such concession. And Clark fails to point to any statement or document that directly and expressly links his disability to a decisionmaker's choice to terminate him. Rather, Clark points to generalized knowledge about his diabetes and the termination itself as direct evidence of discriminatory intent. But that's not direct evidence; it would require us to make an inference.[37]

Clark's strongest argument for direct evidence of discrimination is Vice President McCoy's statement, "perfect. . . . let him go," after he received a picture of Clark not awake at his desk during business hours with the subject line "Charles Clark sleeping." "Where a plaintiff offers remarks as direct evidence, we apply a four-part test to determine whether they are sufficient to overcome summary judgment."[38] "To qualify as direct evidence of discrimination, workplace comments must be 1) related [to the protected class of persons of which plaintiff is a member]; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment

---

[36] *Id.* at 479.

[37] Similarly, in *Herster*, we held that an instructor did not show direct evidence of sex discrimination in her pay discrimination suit against a university under Title VII where her male supervisor referred to her as a "trailing spouse" who got her job so that her husband would accept a professorship, said that he thought she was going to have children and be happy, and that she was acting like a "princess." 887 F.3d at 186–87. We determined that these were "stray remarks," not direct evidence of discrimination. *Id.* Although the "trailing spouse" comment may have implied sex was a factor in compensation, someone could be referred to as a "trailing spouse" irrespective of sex, and the supervisor's other comments would have required an inferential leap to prove that the university paid the instructor less because of her sex. *Id.*

[38] *Rodriguez*, 820 F.3d at 764 (quoting *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012)).

decision at issue; and 4) related to the employment decision at issue."[39] McCoy's statement is from the same day as Clark's termination and it was about terminating Clark, thus satisfying the second and fourth requirement. But unlike in *Portis*, *Etienne*, and *Jones*, the evidence suggests that the speaker (McCoy) was not the ultimate decisionmaker regarding termination.[40] And Clark admits as much in his brief—undercutting his own argument. Plus, there's nothing in the email with the picture or McCoy's response about Clark's disability. So McCoy's statement can't be direct evidence of disability discrimination because it fails to satisfy the first and third requirement. And, problematically, accepting the statement as direct evidence would require an inference. If the subject line had been something like "Charles Clark in a diabetic emergency," and McCoy had responded "perfect. . . . let him go," that might pass muster as direct evidence of discrimination. It would certainly be more akin to the statements in *Portis*, *Etienne*, *Jones*, and *Rodriguez*, which all included explicit references to the forbidden factor (sex, race, or disability). But those are not the facts here. McCoy's statement is not direct evidence of discrimination.[41]

---

[39] *Id.* (quoting *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001) (alterations in original) (internal quotation marks omitted)).

[40] McCoy stated that "[he] didn't make the termination decision." Rather, "Mays made the termination decision based on that picture." And HR Manager "Jeff Mays makes all termination decisions."

[41] *See Rodriguez*, 820 F.3d at 764 (finding that a supervisor's remarks about a former employee with PTSD being "unstable" are not direct evidence of disability discrimination where the former employee failed to prove all elements of the four-part test and the court would have had to make an inference regarding causation); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 898 (5th Cir. 2002) (finding that a then-President's remark that the company had "skip[ed] a generation" in selecting his replacement is not direct evidence of age discrimination where the remark was ambiguous and the President was not responsible for the former employee's termination).

## No. 18-11613

At best, Clark could argue that McCoy's statement provides circumstantial evidence that his disability influenced Champion's decision to fire him. Thus, the district court did not err in finding no direct evidence of discrimination on the basis of disability. We affirm the district court's finding on this issue.

### B.     "Qualified Individual"

Although Clark—like most plaintiffs in disability discrimination suits—failed to provide direct evidence of discrimination, he may still "proceed under the burden-shifting analysis first articulated in *McDonnell Douglas*."[42] Under *McDonnell Douglas*, the plaintiff must carry the initial burden of establishing a prima facie case of discrimination.[43] "To establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; and (3) that he was subject to an adverse employment decision on account of his disability."[44]

This discussion focuses on the second prong—whether Clark was "qualified" for the job. The district court found that Clark was "not a qualified individual under the ADA."[45] Clark argues that the court erred. A plaintiff can

---

[42] *LHC Grp., Inc.*, 773 F.3d at 694.

[43] *McDonnell Douglas*, 411 U.S. at 802.

[44] *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) (internal quotation marks omitted); Americans with Disabilities Act of 1990 § 102, 42 U.S.C. § 12112(a). If the plaintiff "is successful, then [the defendant] must articulate a legitimate, nondiscriminatory reason for terminating [the plaintiff]." *LHC Grp., Inc.,* 773 F.3d at 697. The burden then shifts back to the plaintiff to show that the defendant's "proffered reason is pretextual." *Id.* But we don't reach the second or third step of the burden-shifting analysis because Clark fails to make a prima facie case for discrimination.

[45] The district court prefaced its analysis by finding that, "[Clark] has not met his burden of establishing a prima facie case for disability discrimination because he fails to adequately address the *McDonnell Douglas* burden-shifting framework analysis in his response. The Court will assume *arguendo* that [Clark] adequately responded to [Champion's] Motion and will address each requirement, in turn, needed to establish a prima

13

establish that he is "qualified" by showing that "either (1) [he] could perform the essential functions of the job in spite of [his] disability," or "(2) that a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of the job."[46] "[T]he question is whether he was qualified at the time of his termination."[47]

We agree with the district court: The evidence suggests that Clark could not perform the essential functions of the job with or without an accommodation. The Champion Handbook details expectations of employees, including offenses "that may result in . . . immediate termination."[48] One such offense is "failure to maintain alertness." Clark conceded that if he is not awake at work, he is not alert and can't do his job.[49]

But Clark still argues in his brief that he is qualified. Yet Clark fails to cite a single case from the Fifth Circuit to support his argument that he was a

---

facie case for disability discrimination." Our analysis makes the same assumption and then analyzes the "qualified individual" prong.

[46] *Moss*, 851 F.3d at 417–18 (internal quotation marks omitted).

[47] *Id.* at 418. Notably, we consider all relevant factors to determine whether an employee was qualified at the time of his termination. *See* 42 U.S.C. § 12111(8). "[T]he inquiry does not stop with [the employee]; the court must also look at whether [the employer] met its accommodation obligations." *Grubb v. Sw. Airlines*, 296 F. App'x 383, 388 (5th Cir. 2008).

[48] The Handbook's list of terminable offenses includes "[f]ailure to maintain alertness: . . . sleeping or giving the appearance of sleeping at any time while on duty or on the client's property (including breaks) is considered a terminable offense." The ADA states that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description . . . this description shall be considered evidence of the essential functions of the job." § 12111(8). Although not in a written description of Clark's specific position, being awake is arguably an essential function of all jobs at Champion.

[49] "[McAllister:] If you are not awake at work, you can't do your job. Right? [Clark:] "Obviously, yes." "[T]he ADA does not insulate an employee from adverse action taken by an employer because of misconduct in the workplace, even if his improper behavior is arguably attributable to an impairment." *Green v. Medco Health Sols. of Tex., LLC*, 947 F. Supp. 2d 712, 729 (N.D. Tex. 2013) (internal quotation marks omitted).

"qualified individual."[50] His argument boils down to two points: First, Clark contends that his sleeping or being unconscious on the job would not pose a safety risk to others. Even if true, that does not satisfy Clark's burden of proving that he could perform the essential functions of his job. And we have found that an employee in a non-safety-related position was not a "qualified individual" under the ADA where he repeatedly fell asleep at work due to his disability.[51]

Second, Clark argues that Champion fails to present evidence of his poor performance in general. But Champion doesn't need to. Champion insists that it terminated Clark because he was sleeping at his desk during the work day.

---

[50] Rather, all the cases Clark cites are from the Ninth Circuit or a California federal district court, except for one Southern District of Indiana case. These cases are nonbinding, and we did not find them persuasive because, among other things, they seem to overlook the requirement that the employee be qualified *at the time of termination*. The cases are also factually distinguishable. Take *Halsey*, for example. In that case, unlike this one, the employer did not have a companywide policy that required alertness and made sleeping on the job a terminable offense, and the terminated employee was a training attendee—not a personnel manager like Clark who was responsible for training other employees and served as an example of the policies he enforced. *See generally Halsey v. JP Morgan Chase Bank*, No. 08-01335, 2009 WL 3353459 (N.D. Cal. Oct. 16, 2009). In *Rednour*, the court concluded that because there is "a triable issue of fact whether [the proposed accommodation] would have rendered [the former employee] able to perform the essential functions of her job had it been implemented, we cannot at this stage conclude that [the former employee] was not a 'qualified individual'—with this accommodation in place—as a matter of law." *Rednour v. Wayne*, 51 F. Supp. 3d 799, 818 (S.D. Ind. 2014). Similarly, in *Dark*, the court concluded that there was "a genuine issue of material fact as to whether Dark was qualified with [his proposed] reasonable accommodation," where his employer failed to even consider the proposed accommodation. *Dark v. Curry County*, 451 F.3d 1078, 1091 (9th Cir. 2006). Unlike the former employees in *Rednour* and *Dark*, Clark has never proposed an accommodation for diabetes-induced unconsciousness and amnesia that would enable him to do the essential functions of his job. Clark's citation to *Gambini* is also unpersuasive; at best, the parenthetical he offers is tangentially related to the "qualified individual" issue, and the *Gambini* court applied Washington Supreme Court precedent to Washington state law. *See generally Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087 (9th Cir. 2007). Clark's citation to *Walgreen* is also unpersuasive; the discussion of the prima facie case "focuses solely on the third prong" and does not address the second prong—whether the former employee was a "qualified individual." *E.E.O.C. v. Walgreen Co.,* 34 F. Supp. 3d 1049, 1058−59 (N.D. Cal. 2014).

[51] *Grubb*, 296 F. App'x at 388.

Even assuming Clark does his job well while he's awake, by his own admission he cannot do his job at all when he's asleep. As we have held, maintaining consciousness is a basic element of any job.[52] In *Grubb*, a flight instructor sued an airline under the ADA after it terminated him because he repeatedly fell asleep at work.[53] But we held that the instructor was not a "qualified individual" under the ADA due to his sleep apnea because being conscious and alert was a basic element of his job performance.[54] Like the ground-based flight instructor in *Grubb*, Clark was responsible for training. Although Champion doesn't allege Clark fell asleep *during* training, he certainly wasn't able to train—or complete any other essential functions of his job—without being awake. So Clark failed to prove that he could perform the essential functions of his job in spite of his disability.

Clark also fails to show that a reasonable accommodation would have allowed him to perform his job. Clark requested—and was granted—multiple accommodations related to his diabetes, including a refrigerator to store insulin and time off for doctor appointments. But he did not request an

---

[52] *Id.*

[53] *Id.* at 384.

[54] *Id.* at 388 ("Grubb's alleged disability involved a basic element of the performance of his job as a flight instructor, namely being conscious and alert. . . . [C]ourts have repeatedly approved of ADA-challenged discharges for falling asleep at work, particularly in safety-sensitive positions. *See, e.g.*, *Leonberger v. Martin Marietta Materials, Inc.*, 231 F.3d 396, 399 (7th Cir. 2000); *Cannon v. Monsanto Co.*, No. 05-5558, 2008 WL 236922, at *4 (E.D. La. Jan. 28, 2008)."). Although *Grubb* is unpublished, this circuit, like many of its sister circuits, has a history of published cases establishing that lack of physical presence is a commonly accepted disqualification for ADA protection. *See, e.g.*, *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996); *Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir. 1994); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994); *Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994). "An employee who does not come to work cannot perform any of his job functions, essential or otherwise." *Rogers*, 87 F.3d at 759 (quoting *Tyndall*, 31 F.3d at 213) (internal quotation marks omitted). Similarly, an employee who is sleeping or unconscious at work cannot perform any of the functions of his job, essential or otherwise, during that time.

accommodation for loss of consciousness due to diabetes.[55] And Clark still has not identified any accommodation that would have allowed him to perform his job while suffering from diabetes-induced amnesia and unconsciousness—probably because interviewing, hiring, training, disciplining, and terminating security guards requires him to be awake. Thus, Clark has failed to prove that, at the time of his termination, he could perform the essential functions of his job—with or without accommodation. So we affirm the district court's finding that Clark was not a "qualified individual."

## C.    Disability-based Harassment

The next issue is whether the district court erred in finding that Clark's "disability harassment claim fails to meet the standards imposed by the Fifth Circuit." Clark argues that he was subjected to "a long and ongoing pattern of harassment" due to "conditions arising from his diabetes." Specifically, Clark asserts that he developed eczema and dry skin because of his diabetes, which prevented him from following Champion's policy requiring employees to maintain clean-shaven faces. Clark alleges that Champion denied him part of a raise because of this inability to shave. And Clark alleges that, due to surgery on his left shoulder, he was unable to follow Champion's dress code requiring that employees tuck in their shirts. Clark claims that he was subjected to continuing ridicule relating to these dress code and grooming requirements.

To prevail on a claim of disability-based harassment, "the plaintiff must prove: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or

---

[55] "It is the plaintiff's burden to request reasonable accommodations." *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).

should have known of the harassment and failed to take prompt, remedial action."[56] The parties don't dispute that Clark belongs to a protected group. So we assume for argument's sake that he does.

Importantly, the disability-based "harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment."[57] "In determining whether a work environment is abusive, we consider the entirety of the evidence in the record, including 'the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.'"[58]

Here, Clark's disability-based harassment claim is based upon a disagreement with Champion regarding his compliance with the company's dress and grooming policy. In support of Clark's allegations, he described a series of emails with Champion. These emails capture a disagreement between Clark and Champion regarding terms of employment and accommodations.[59] And we held in *Credeur* that a disagreement with an employer over terms of employment or an accommodation do not amount to harassment.[60] In fact, we

---

[56] *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235–36 (5th Cir. 2001).

[57] *Credeur v. Louisiana Through Office of Att'y Gen.*, 860 F.3d 785, 796 (5th Cir. 2017) (quoting *Flowers*, 247 F.3d at 236).

[58] *Id.* (quoting *Flowers*, 247 F.3d at 236).

[59] For example, Clark requested an accommodation post-shoulder surgery exempting him from the requirement to tuck in his shirt. But the doctor's note he provided simply prohibited "manipulation of the left arm until released by the surgeon"; it did not state whether that limitation would prevent Clark from tucking in his shirt. Champion wanted more clarity, so Clark submitted additional medical documentation. Also, when Champion agreed to exempt Clark from the shaving requirement for medical reasons, it offered him an additional fifty cents per hour if he would become compliant with the clean-shaven policy. Clark asserted that this was harassment and that he was denied a raise.

[60] *Credeur*, 860 F.3d at 797 (affirming summary judgment for the employer on former employee's harassment claims and finding that disputes with her supervisors concerning job

contrasted the employee–plaintiff's claims in *Credeur* to those of the employee–plaintiff in *Flowers*, where the alleged harassment included "humiliating and offensive *ad hominem* attacks that had no rational relation to Flowers's work performance. The conduct Credeur identifies is not at all analogous."[61] Notably, Clark does not allege any *ad hominem* attacks, teasing, physical or verbal threats, or inappropriate language. Clark's allegations are like those in *Credeur,* not *Flowers.* Even assuming that the alleged harassment was based on Clark's disability, it was not severe or pervasive and did not create an abusive working environment. So Clark's disability-based harassment claim is unavailing.

But the district court found another reason why Clark's claim fails:[62] Clark failed to satisfy prong three—that is, he didn't show that the harassment was based on his disability. The doctor's letter excusing Clark from shaving mentions "eczema and dry skin"—not diabetes.[63] The only evidence Clark provided to connect the alleged harassment to his diabetes is his own

---

performance, workplace rules, and reasonable accommodations were not "harassment" and did not create a hostile work environment).

[61] *Id.* at 796 (discussing *Flowers*, 247 F.3d at 237). In *Flowers*, we held that there was sufficient evidence that the employer harassed an HIV-positive employee where, once her HIV-positive status became known, her supervisors suddenly avoided her, intercepted or eavesdropped on her calls, refused to shake hands or socialize with her, gave her negative performance appraisals for the first time, lured her into adversarial meetings on false pretenses, "randomly" drug-tested her four times in one week, called her a "bitch," and ultimately fired her. *Flowers*, 247 F.3d at 236−37.

[62] Although the district court did not address whether the alleged harassment was severe or pervasive, we may affirm a grant of summary judgment on any ground the record supports. *Windham v. Harris County*, 875 F.3d 229, 234 (5th Cir. 2017) (citing *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 323 (5th Cir. 2017)); *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 221 (5th Cir. 2011) ("Even if we do not agree with the reasons given by the district court to support summary judgment, we may affirm the district court's ruling on any grounds supported by the record.") (quoting *Lifecare Hosps., Inc. v. Health Plus of La., Inc.*, 418 F.3d 436, 439 (5th Cir. 2005)).

[63] The letter states, "[p]lease excuse [Clark] from the shaving requirement as he has eczema and dry skin."

conclusory assertion that his diabetes contributes to his skin condition, and thus his inability to shave. That is not enough.[64] So any alleged harassment is not based on Clark's diabetic condition.

Likewise, the conduct complained of regarding Champion's dress code is based upon Clark's alleged inability to tuck in his shirt due to surgery on his left shoulder, not diabetes. Yet Clark repeatedly stated in his deposition that diabetes is the only disability that is the basis for his lawsuit. In sum, Clark failed to sufficiently connect his harassment claims—based on his alleged inability to shave or tuck in his shirt—to his diabetes. So Clark failed to satisfy the third prong—that the alleged harassment was based on his disability. As such, we affirm the district court's finding on this issue.[65]

## D. Accommodations

The next issue is whether the district court erred in finding no failure to accommodate Clark's disability and no failure to engage in an interactive process. "Under the ADA, it is unlawful for an employer to fail to accommodate

---

[64] *Credeur*, 860 F.3d at 793 ("'[A]n employee's unsupported testimony that she could perform her job functions from home' does not create a genuine dispute of fact to preclude summary judgment.") (quoting *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 763−64 (6th Cir. 2015) (en banc)); *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 n.10 (5th Cir. 1996) ("[C]onclusory allegations, speculation, and unsubstantiated assertions [regarding an alleged disability] are inadequate to satisfy the [former employee]'s burden.") (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994)).

[65] Clark also asserted disability-based harassment claims under the Texas Labor Code, pursuant to which a charge "must be filed not later than the 180th day after the date the alleged unlawful employment practice occurred." TEX. LABOR CODE § 21.202(a). As the district court explained, "[a] charge filed with the EEOC, more than 180 days after the occurrence of an alleged unlawful employment practice under the [TCHRA], is subject to dismissal as time-barred. *See Adams v. DaimlerChrysler Servs. NA LLC,* 252 F. App'x 681, 683 (5th Cir. 2007)." Clark filed his EEOC charge on January 10, 2017. Applying the limitation imposed by the TCHRA, the district court concluded that "all state law claims arising before July 14, 2016[] must be dismissed as time-barred." We agree with the district court's analysis. Here, the alleged disability-based harassment occurred in the spring of 2016, so Clark's harassment claim would be time barred. To the extent he alleges that the harassment continued on or after July 14, 2016, the analysis regarding Clark's harassment claim under the ADA would apply to the TCHRA as well. *See supra* note 16.

the known limitations of an employee's disability."[66] Clark "must prove the following statutory elements to prevail in [his] failure-to-accommodate claim: (1) [he] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations."[67] As explained in Part III.B, Clark failed to show that he's a "qualified individual" under the ADA. That failure alone is fatal to his failure-to-accommodate claim.[68]

Even if Clark was a "qualified individual," his failure-to-accommodate claim fails at a more fundamental level. Clark devoted a mere two sentences to his argument on this issue.[69] As the district court noted, he "fails to pinpoint any request(s) that were not subsequently accommodated." Clark did not request an accommodation for loss of consciousness due to diabetes. Clark claims he "never had an opportunity to seek an accommodation or request the interactive process because he was fired while he was in the emergency room." This "argument" is more of an admission. Clark had ample opportunity—over a year, in fact—to request an accommodation.[70] "It is the plaintiff's burden to

---

[66] *Credeur*, 860 F.3d at 792 (quoting *Griffin*, 661 F.3d at 224).

[67] *Feist v. Louisiana, Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (internal quotation marks omitted).

[68] *See Credeur*, 860 F.3d at 792 (analyzing Credeur's failure-to-accommodate claim and noting, "[a]t issue is whether Credeur is a 'qualified' individual within the meaning of the ADA. If she is not, our inquiry ends.").

[69] Contrary to Rule 28, this section also lacks a single citation to the record or case law. FED. R. APP. P. 28(a)(8) (The appellant's brief "must contain: (A) appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which appellant relies . . . .").

[70] Clark knew about his diabetes before he started work at Champion. And he claims unconsciousness is a potential effect of his condition. Clark worked at Champion for over a year, but he never requested an accommodation to address diabetes-induced unconsciousness or amnesia. Yet he managed to make multiple other diabetes-related accommodation requests during that time. And, as discussed, Champion granted those requests.

request reasonable accommodations."[71] Clark did not carry his burden. Regardless of the framing, Clark is really requesting an after-the-fact, retroactive exception to the alertness policy as an accommodation for his underlying disability—diabetes. But that is not an accommodation under the ADA.[72]

Clark's failure to request an accommodation means that his failure-to-engage-in-the-interactive-process claim is dead on arrival: Without a request, Champion could not possibly fail to engage in an interactive process.[73] As such, we affirm the district court's findings regarding Clark's failure-to-accommodate and failure-to-engage-in-the-interactive-process claims.

## E.    Retaliation

---

[71] *Jenkins*, 487 F.3d at 315 ("'In general . . . it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed.' . . . If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one."); *see Taylor*, 93 F.3d at 165 (citing 29 C.F.R. § 1630.9, App. (1995)).

[72] *Moss*, 851 F.3d at 418 n.2 ("Moss also argues that 'continued employment in his own Deputy Constable position' would be a reasonable accommodation, but we fail to see how this is an accommodation at all, let alone a reasonable accommodation."); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 319 (5th Cir. 1997) (finding that a qualified individual with a disability who asks *only* to return to work—but who is instead fired by his employer—has not advanced a failure to accommodate claim under § 12112(b)(5)); *see also Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995) (granting summary judgment in ADA case in which the plaintiff-employee conceded he was terminated for failing to monitor and control his diabetes because "Siefken is not asking for an accommodation; he is not asking the Village to change anything. He is asking for another chance . . . . But the ADA does not require this"), cited with approval in *Burch*, 119 F.3d at 319 n.14.

[73] "[O]nce the employee presents a request for an accommodation, the employer is required to engage in the interactive process so that *together* they can determine what reasonable accommodations might be available." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 622 (5th Cir. 2009); *see Taylor,* 93 F.3d at 165 ("[I]t is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one. If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one.") (internal citation omitted).

No. 18-11613

The next issue is whether the district court erred in finding that Clark failed to present sufficient evidence to support his retaliation claim.[74] *McDonnell Douglas* provides the burden-shifting framework for claims of unlawful retaliation under the ADA.[75] "To show an unlawful retaliation, a plaintiff must establish a *prima facie* case of (1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action."[76] If "the plaintiff has established a *prima facie* case, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action."[77] If the defendant does so, "the plaintiff must adduce sufficient evidence that the proffered reason is a pretext for retaliation. Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred."[78]

Here, Clark asserts that he suffered retaliation—in the form of termination—after lodging an internal complaint alleging disability-based harassment. Clark easily satisfied prong two of the prima facie case: He suffered an adverse employment action when he was fired. But Clark runs into trouble with the rest of the test. Assuming that filing the complaint was protected activity, we agree with the district court that Clark failed to show a causal connection between his filing of the internal complaint and his

---

[74] The ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

[75] *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1112 (5th Cir. 1998).

[76] *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 348–49 (5th Cir. 2019) (quoting *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999)); *see also Credeur*, 860 F.3d at 797 (same).

[77] *Nall*, 917 F.3d 335, 349 (5th Cir. 2019) (quoting *Seaman*, 179 F.3d at 301).

[78] *Id.*

termination. To establish this requisite causal link—prong three of the prima facie case—"the evidence must show that the employer's decision to terminate was based in part on knowledge of the employee's protected activity."[79]

Clark attempts to buttress his retaliation claim with emails suggesting that certain superiors at Champion were eager to see Clark leave—voluntarily or involuntarily.[80] To be sure, these emails are not exonerating. But neither are they incriminating. What matters is that Clark doesn't connect his alleged "protected activity"—his complaint about the handling of the grooming issues filed eight months prior to his termination—to his superiors' desire for him to leave. And some of the statements on which Clark relies explicitly undercut any argument for causation. One email chain specifically references Clark's handling of unrelated overtime issues as the reason for his supervisor's dissatisfaction: "Hopefully [Clark] resigns soon because if he had his way our OT would still be at 8%." Even if Clark's superiors were out to get him because of his handling of overtime, or for some other undisclosed reason, he presented

---

[79] *Sherrod*, 132 F.3d at 1122.

[80] For example, there are multiple emails between management saying variations of "hopefully [Clark] resigns soon." Another email—which Clark's immediate supervisor sent about seven months after Clark filed his complaint—stated that he wanted to "start applying more pressure for him to leave." When asked about this email during his deposition, however, Clark's supervisor referenced Clark's "bad attitude" and "excessive absences" as reasons for wanting him to leave. And Clark does not present any contradictory evidence.

Clark also relied on the timing of these emails as circumstantial evidence of causation. He emphasizes that these emails were all sent after he filed his complaint in April 2016. But the timing may hurt more than it helps him. The vast majority of Clark's employment at Champion occurred after he filed the internal complaint; Champion did not terminate him until eight months later. Plus, managers exchanged these emails over many months, and they did not originate immediately—or even shortly—after Clark filed the internal complaint. Rather, it seems as though independent events (like Clark's absences or receiving reports of him sleeping in his office) prompted these emails. Also, in July 2016, Clark told Mays that he would "continue to do [his] job for the next few months until [he] graduates from EMT school[] and find[s] a position in the medical field." So it seems like Clark's departure announcement—not his internal complaint—prompted an email chain asking whether Clark had given notice, and a response hoping that he would soon.

no evidence connecting his internal complaint to his termination.[81] This failure to show a prima facie case is a sufficient basis to affirm the district court's grant of summary judgment on this issue in Champion's favor.[82]

---

[81] *See Reed*, 701 F.3d at 440 n.4 ("In addition, to the extent that Reed complains that the real reason for his termination was his coworkers' 'setup job' so that they could oust him out of a competition for a free cruise, his claim is not cognizable. The [state civil rights law] does not protect an employee against unfair business decisions, only discriminatory ones.") (citing *Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997)).

[82] Even if Clark established a prima facie case of unlawful retaliation, his claim would remain unavailing. Clark failed to show that Champion's proffered legitimate, non-discriminatory reason for Clark's termination—his sleeping at work in violation of Champion's alertness policy—was pretextual. "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (quoting *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378−79 (5th Cir. 2010)). Clark doesn't argue that Champion treated other employees found sleeping or unconscious at work any differently. In fact, the evidence shows that Champion previously terminated employees for sleeping on the job in violation of the alertness policy. And Clark was involved in at least one of those terminations. So he cannot use disparate treatment to show pretext. *See Wright v. Chevron Phillips Chem. Co., L.P.*, 734 F. App'x 931, 934 (5th Cir. 2018) (affirming summary judgment in discrimination case because plaintiff failed to show evidence that other employees caught sleeping on the job received more favorable treatment).

But Clark can't show that Champion's reason for termination was false either. "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Caldwell*, 850 F.3d at 242 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). It's not the ultimate accuracy of Champion's reason that matters, but only whether it believed—in good faith—that Clark violated company policy by failing to be awake and alert at work. *See, e.g.*, *Jackson*, 602 F.3d at 379 (explaining that a former employee's claim of innocence relating to the proffered basis for termination—violation of the company's written sexual harassment policy—does not create a factual issue regarding the falsity of that reason because the issue is not whether the former employee violated the policy; rather, it is whether the employer believed the former employee violated the policy and acted upon that belief in good faith); *Miller v. Metro Ford Auto. Sales, Inc.*, 519 F. App'x 850, 853 (5th Cir. 2013) ("Importantly, even if Metro Ford mistakenly assumed that Miller intentionally violated company policy by violating the consignment agreement, that mistake is insufficient to demonstrate that Metro Ford's stated rationale for terminating him was mere pretext for retaliation."). The evidence shows that Champion had received multiple reports from multiple employees about Clark sleeping in his office during the workday. So he had a history making it believable that he would be sleeping in his office. And on the day Champion terminated Clark, multiple employees reported seeing Clark sleeping in his office and in no apparent distress. In fact, Clark admitted that he was not awake and unable to do work that morning. But then Clark awakened on his own—without medication or intervention—and walked about the office talking normally. Sleeping (or appearing to sleep) at one's desk during the workday is an immediately terminable offense at Champion. And

No. 18-11613

Clark has not proven that he would not have been terminated "but for" filing an internal harassment complaint eight months prior.[83] So we affirm the district court's grant of summary judgment for Champion relating to Clark's retaliation claim.

## F.     Damages

Finally, Clark argues that the district court erred in denying all of his claims for damages. Clark asserts in a conclusory manner that his "claims should be reinstated and that he is entitled to litigate his damages for back pay, front pay, compensatory damages, attorney fees, costs and interests." As discussed in Parts III.A−E, we agree with the district court's grant of summary judgment for Champion. Absent a finding of liability, Clark is not entitled to litigate his damages claims. So we affirm the district court on this issue as well.

## CONCLUSION

For these reasons, we AFFIRM the district court across the board.

---

Champion management actively enforced this policy. Clark never provided any medical evidence that a diabetic emergency caused him to lose consciousness the morning of his termination. Based on these facts, it seems like Champion believed in good faith that Clark had violated its alertness policy. So Clark's argument that the reason was pretextual is unpersuasive.

[83] *See Sherrod*, 132 F.3d at 1122.