# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 7, 2024

Lyle W. Cayce
Clerk

———————

No. 23-11101

———————

Jennifer T. Julian,

*Plaintiff—Appellant*,

*versus*

Louis DeJoy, *Postmaster General United States Postal Service (Southern Area) Agency*,

*Defendant—Appellee*.

———————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:21-CV-718

———————————————————

Before Wilson and Douglas, *Circuit Judges*, and Vitter, *District Judge*.[*]

Per Curiam:[†]

After a series of disagreements with her supervisors at the United States Postal Service (USPS), Jennifer T. Julian brought claims for discrimination, hostile work environment, and retaliation under the Age

———————————————

[*] United States District Judge for the Eastern District of Louisiana, sitting by designation.

[†] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a), and the Rehabilitation Act, 29 U.S.C. § 794. The district court granted summary judgment for the Postmaster General, concluding that Julian failed to establish a prima facie case for any of her claims. Julian appeals, specifically challenging the court's ruling on her harassment and disability-discrimination claims. We affirm.

## I.

### A.

Julian began working for USPS in 1999 as a mail carrier in Olney, Texas. After suffering an injury to her foot the following year while on the job, she filed a workers' compensation claim. In 2002, she received a modified job assignment—as a "modified distribution and window clerk"—that limited her standing and walking to ten to fifteen minutes each per hour. In 2004, she was promoted to postmaster of a single-employee post office in Scotland, Texas.

In October 2016, during an agency-wide reorganization, USPS eliminated the postmaster position in Scotland. Julian voluntarily downgraded from postmaster, a salaried management position, to non-traditional full-time (NTFT) clerk, an hourly non-management position, so that she could remain in Scotland. In her new position, Julian reported to Lea Farney, the postmaster in Henrietta, Texas, who set Julian's work schedule and hours. Sid Winn, who had become Manager of Post Office Operations (MPOO) for Julian's region, was her second-level supervisor above Farney.

As she adjusted to her position as an NTFT clerk, Julian began to clash with her supervisors over various work-related issues. One of the first was her work placement. Soon after the downgrade, Julian accepted a temporary work assignment as the acting supervisor in Stephenville, Texas.

No. 23-11101

After six months, Winn decided not to renew Julian's detail in Stephenville—against her wishes—so Julian returned to Scotland in September 2017.

Another dispute involved the chain of command. When Julian had been a postmaster, the MPOO was her direct supervisor. Julian no longer reported directly to the MPOO once she became an NTFT clerk, but she persisted in emailing Winn regarding routine workplace matters. In fact, Julian had to be repeatedly told to communicate her concerns to her direct supervisor, Farney, rather than to Winn.

Julian also became distressed due to recurring paycheck errors. Farney informed Julian in February 2019 that Julian had been erroneously charged 32 hours of leave without pay (LWOP). Farney promised to fix the error, and it was rectified. A similar incident happened in June 2019; Farney again apologized and corrected the mistake.

The most intractable problem proved to be overtime pay. Julian's supervisors became concerned with the amount of overtime Julian was incurring. In October 2017, Farney noticed that Julian was taking nearly an hour to close the office after business hours, and Farney alerted Julian to the excessive overtime. This issue surfaced again in August 2018, when Farney expressed her disapproval via an email to Julian: "I expect you to be done and out of your office by 4:15 no later [than] 4:30. . . . 5 o'clock is not acceptable when it could have been avoided." Julian pushed back: "I will not get out of here before 4:30. NO way I can get it done in 15 minutes." To this, Farney responded: "I am arranging for . . . audits to be done with my offices and we will look at the different practices that may or may not be occurring. We can also address the issue of you not being able to be done and gone in 15 min . . . ."

3

No. 23-11101

Farney's concern regarding overtime pay led to another disagreement over the scope of Julian's responsibilities. Julian demanded overtime pay for office cleaning and lawn care, which had been parts of Julian's job as postmaster. As a clerk, Julian asserted that these duties went beyond those stipulated in her contract, and she refused to do them during her regular hours. USPS ended up hiring contractors for lawn care and custodial work, but continued to insist that it was Julian's responsibility to maintain a clean office environment.

After months of investigation, USPS discovered an underlying reason for the excessive overtime pay that Julian had been receiving. Due to a discrepancy between two USPS electronic systems, many of Julian's regular work hours were marked as out-of-schedule (overtime) hours. As a result, Julian had unintentionally received credit for hundreds of overtime hours in excess of her actual hours, and according to USPS's calculation, thousands of dollars in excess pay. In an unsuccessful attempt to fix the software issue, USPS digitally abolished and recreated Julian's NTFT clerk position in the payment system, which created an auto-generated letter that informed Julian that her position was being abolished. Though USPS quickly rescinded the form letter, Julian was (understandably) unhappy.

In January 2019, Julian complained that $155 had been deducted from her most recent paycheck, which she interpreted as an unauthorized garnishment for the overtime payments she had received. Whether the deduction was caused by a system-wide error or USPS's attempt to recover the out-of-schedule pay is unclear, but USPS returned the money to Julian after a few weeks.

Farney tried to persuade Julian to return the out-of-schedule pay voluntarily. When Julian refused, USPS issued a demand letter on May 17, 2019, requesting that Julian reimburse more than $3,000. In response, Julian

filed a union grievance, which USPS denied. Julian then initiated administrative litigation under the Debt Collection Act. The parties eventually settled; Julian was allowed to keep the money, and the administrative judge dismissed her petition.

Meanwhile, between 2018 and 2019, Julian filed a number of overlapping discrimination complaints. In September 2018, Julian and Sharon Drummond, another former postmaster who had become an NTFT clerk, filed an internal human resources complaint for workplace harassment by Farney and Winn. The complaint referenced many of the above issues, including Julian's disputes regarding overtime pay and office closing procedures. After an investigation into the allegations, USPS concluded in December 2018 that the harassment claim was unsupported.

In November 2018, Julian filed an Equal Employment Opportunity (EEO) complaint—the one underlying this suit—alleging age and disability discrimination. USPS issued a final decision in July 2019, concluding that the evidence did not support a finding that Julian was subjected to the alleged discrimination. In October 2020, on appeal, the Equal Employment Opportunity Commission (EEOC) affirmed USPS's final decision. Julian's request for reconsideration was subsequently denied, though the EEOC gave her a right-to-sue letter.

In June 2019, Julian filed another EEO complaint, after she filed the union grievance, alleging that USPS's demand letter regarding the out-of-schedule pay constituted harassment and retaliation. In July 2019, USPS dismissed the complaint in a final decision, considering it a collateral attack on the Debt Collection Act proceeding in another forum. The EEOC affirmed in November 2019.

Julian filed a third EEO complaint in July 2019 for the erroneous charge of LWOP from the previous month and USPS's demand letter. In

February 2020, USPS again dismissed her complaint after finding no discrimination. The EEOC affirmed in September 2020.

In November 2020, Julian took extended medical leave before applying for disability retirement in August 2021. Her retirement became effective in March 2022.

## B.

In June 2021, proceeding *pro se*, Julian filed suit against Louis DeJoy, the Postmaster General—a culmination of the process that began with her initial November 2018 EEO complaint. In March 2022, then represented by an attorney, she filed an amended complaint. In that complaint, she detailed her long-running disputes with USPS over her pay and job responsibilities. She alleged claims for age discrimination and hostile work environment under the ADEA, for disability discrimination and hostile work environment under the Rehabilitation Act, and for retaliation under both laws.

The Postmaster General moved for summary judgment, contending that Julian had not established a prima facie case for any of her claims. The Postmaster General portrayed the underlying history as "Julian chaf[ing] at her non-management, subordinate role as an NTFT clerk," and averred that Julian had presented no evidence to show that her supervisors' decisions "were motivated by her age or alleged disability."

The magistrate judge analyzed Julian's claims in detail and recommended that the district court grant the Postmaster General's summary judgment motion. The magistrate judge treated Julian's cause of action for "disability discrimination" under the Rehabilitation Act as two distinct claims, for disparate treatment and failure to accommodate. Applying the *McDonnell Douglas* framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), the magistrate judge concluded that Julian had not established a prima facie case of either discrimination or

retaliation, and further, that she could not show that the legitimate, non-discriminatory reasons proffered by USPS for its actions were pretextual. The magistrate judge also determined that Julian had not established the elements of a failure-to-accommodate claim or a hostile-work-environment claim under either the ADEA or the Rehabilitation Act. The recommendation concluded: "Julian has not offered sufficient summary judgment evidence to show that there is a genuine issue of fact for trial on her numerous claims." Though Julian lodged objections, the district court adopted the magistrate judge's findings and recommendation and entered summary judgment for the Postmaster General.

## II.

Julian now appeals. She contends that the district court erred in granting summary judgment for USPS on her disability-discrimination claim under the Rehabilitation Act and hostile-work-environment claims under the ADEA and the Rehabilitation Act. We address each claim in turn.

We review a summary judgment *de novo*, applying the same legal standards as the district court. *Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.*, 951 F.3d 248, 255 (5th Cir. 2020). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.'" *Ahders v. SEI Priv. Tr. Co.*, 982 F.3d 312, 315 (5th Cir. 2020) (quoting *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)). "We construe all facts and inferences in the light most favorable to the nonmov[ant] . . . ." *Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005).

### III.

Though Julian appeals the dismissal of her "disability discrimination" claim, she does not make clear whether she is challenging the district court's disparate-treatment or failure-to-accommodate analysis. This court has previously explained that they are distinct claims, "although their methods of proof are related." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 703 n.6 (5th Cir. 2014). The district court held that Julian did not establish a prima facie case for either claim. To contest that ruling as to both claims on appeal, Julian had to do so expressly. *See King v. DFW Int'l Airport Bd.*, No. 23-11084, 2024 WL 4132676, at *4 (5th Cir. Sept. 10, 2024) (unpublished). Julian's focus on USPS's purported failure to provide reasonable accommodations does little to clarify, as an employer's failure to accommodate can be a relevant factor in both analyses. *See id.* In any event, we need not divine exactly which claim is before the court because we agree with the district court that Julian fails to establish a prima facie case for either one.

To state a prima facie disparate-treatment claim under the Rehabilitation Act,[1] Julian must prove "(1) that [she] has a disability; (2) that [she] was qualified for the job; [and] (3) that [she] was subject to an adverse employment decision on account of [her] disability." *LHC Grp.*, 773 F.3d at 697 (citing *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)). When a plaintiff relies on circumstantial evidence of discrimination, as Julian does here, this court applies the *McDonnell Douglas* burden-shifting framework. *E.g.*, *Caldwell v. KHOU-TV*, 850 F.3d 237, 241–42 (5th Cir.

---

[1] When analyzing Julian's Rehabilitation Act claim, we employ the same framework as for claims under the Americans with Disabilities Act (ADA) because "[t]he prima facie case of discrimination under the [Rehabilitation Act] is operationally identical to the test under the ADA." *Austin v. City of Pasadena*, 74 F.4th 312, 334 (5th Cir. 2023) (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 676 n.8 (5th Cir. 2004)).

2017).  The framework first requires the plaintiff to establish a prima facie case.  *Id.*  Once the plaintiff makes that showing, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  *Id.*  The burden then shifts back to the plaintiff "to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual."  *Id.* at 242 (quoting *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016)).

Julian's disparate-treatment claim fails at step one.  She insists that her supervisors refused to accommodate her disability, which is "pertinent to whether a plaintiff was qualified for a position," the second element of a prima facie case.  *King*, 2024 WL 4132676, at *4.  But Julian fails to show that she ever asked her supervisors for accommodations, or that they were even aware of her physical limitations.  If her supervisors were unaware of Julian's purported disability or her resulting desire for accommodation, it follows that they could not have made any adverse employment decision *on account of her disability*.

Julian's foot injury occurred in 2000, and she received a modified job assignment in 2002.  However, the relevant timeframe for assessing the existence of a disability is the time of the alleged adverse employment action—in this case, no earlier than 2017–2020.  *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 618 (5th Cir. 2009).  Though the parties dispute whether Julian's foot injury continued to hamper her mobility by 2017, there is no evidence—apart from Julian's own conclusory allegations—that Winn, Farney, or any other USPS employee in a decision-making position knew of Julian's alleged disability or related limitations during the relevant period.

Indeed, the record evidence all points the other way.  Her modified job assignment letter from 2002 states:  "Should the work assignment be changed, you are reminded that it is your responsibility to ensure that all work

performed is in strict compliance with [your] physical limitations as determined by your physician." Julian had several job changes after her 2002 modified job assignment, including becoming a postmaster and then voluntarily downgrading to an NTFT clerk. According to the declaration of Donna Dunker, the Labor Relations Manager of USPS, if an employee who received a modified job assignment "transfers or promotes to another position, it is the employee's responsibility to ensure that all work [she] perform[s] complies with [her] medical restrictions." It was, therefore, Julian's responsibility "to ensure that the work she performed was in strict compliance with her physical limitations."

Julian maintains that she worked with permanent physical limitations and received accommodations when she was the postmaster in Scotland, and that USPS had documentation of her limitations. But there is no evidence that Julian ever sought any accommodation during the relevant time, or through official channels. In 2011, the Department of Labor closed Julian's workers' compensation claim for her foot injury due to inactivity. Dunker herself "conducted a thorough and diligent review of the Fort Worth District Human Resources files . . . [and] did not locate any files to indicate that [Julian] ever submitted a request for reasonable accommodation through District Human Resources." Dunker also stated that Julian "never communicated to [her], or . . . any other USPS employee, that she was requesting any form of modification of her duties or an accommodation due to any medical condition." Phillip Harrison, who took over Farney's position as the postmaster in Henrietta in January 2020, similarly swore that "[Julian] did not submit any documentation, or make any statements, to [Harrison] regarding any medical issue or need for reasonable accommodation in connection with her request to be allowed to work an additional 15 minutes . . . ."

Julian stresses that she directly notified "the management" of her medical limitations but again fails to provide evidence beyond her own insistence that she did. By contrast, Winn and Farney both expressly impugned this assertion. Winn stated that Julian "did not express . . . that she needed any form of reasonable accommodation . . . [or] that she had any medical restriction, physical limitations, work hour restrictions, or workplace limitations"; nor did she "submit any documentation . . . concerning medical restrictions or limitations." Farney, in an affidavit from the 2019 EEO investigation, similarly testified: "[Julian] has stated that she has medical issues[.] I have not been provided documentation nor has she asked for reasonable accommodations. I can only state what she has expressed verbally to me—her heart." Likewise, the contemporaneous email exchanges between the parties do not show that Julian ever mentioned a disability or medical limitations as reasons she could not close the Scotland post office in fifteen minutes. Thus, her claim for disparate treatment fails because she does not substantiate the second and third elements of a prima facie case.

Setting that aside, USPS has also offered legitimate, non-discriminatory reasons for any adverse employment action that occurred. As an example, the fifteen-minute interval allotted for closing the office was standard for post offices under Farney's supervision, and Farney gave the same limitation to another employee at a different facility. Further, Harrison explained that given the "low mail volume and infrequent customer activity" in the Scotland post office, Julian's closing duties did not require longer than fifteen minutes. And any failure to accommodate Julian's purported medical limitations stemmed from Julian's own lack of communication regarding her limitations. Julian offers no contrary evidence from which a reasonable jury could decide that USPS's stated reasons for its actions were pretextual.

Julian's failure-to-accommodate claim fails for identical reasons. Julian "must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) [she] is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Feist v. La., Dep't of Justice, Off. of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013). As addressed above, Julian fails to show that her supervisors knew of her alleged disability or any need for accommodations. USPS could not make reasonable accommodations if her supervisors were unaware of Julian's limitations or need for workplace modifications. This claim was also properly dismissed.

## IV.

We next consider Julian's hostile-work-environment claims. They fail for two reasons. First, as with her disability-discrimination claims, Julian fails to establish a nexus between the alleged harassment and her age or disability. Further, the alleged incidents, even when considered collectively, simply do not rise to the level of objective hostility.

To advance a hostile-work-environment claim based on age discrimination under the ADEA, Julian must establish that

> (1) [she] was over the age of 40; (2) [she] was subjected to harassment, either through words or actions, based on age; (3) the nature of the harassment was such that it created an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.

*Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011).

Julian proffers a long list of actions by USPS that she considers to constitute harassment, including: being asked to return erroneous overtime

pay, being ordered to clean the office and maintain the grounds, having money deducted from her paycheck without notice, not being given enough time to close the office, and being erroneously charged LWOP. According to Julian, Winn and Farney were desperate to have Julian retire early. And she characterizes every workplace disagreement as purposeful harassment, attributing malicious intent to USPS management decisions that concerned her.

But Julian presents no evidence that any of the perceived harassment was *based on her age*. That in itself dooms her claim. On the record before us, her supervisors nowhere reference Julian's age—when communicating with her or otherwise. The mere fact that Julian was near retirement does not itself establish that alleged harassment was based on age. On the contrary, many of the incidents on which Julian relies were most likely unintentional errors. The improper LWOP charges on Julian's paystubs is a prime example—Farney herself was caught off guard and promptly fixed the error. The long-running dispute regarding out-of-schedule payments was the result of a discrepancy in USPS's computer systems, which her supervisors had likewise not foreseen. Other instances involved administrative decisions that Julian received poorly, such as instructing her to communicate through the proper chain of command or asking her to close the office within a standard timeframe.

In an attempt to show her supervisors' conduct was due to her age, Julian maintains that Cindy Minor, a younger employee, had no problem with overtime pay and was given ample time to close her office. Julian and Minor, however, were not similarly situated. They shared the same secondary supervisor, Winn, but Julian directly reported to Farney, and Minor, who was stationed in Montague, Texas, worked directly under Michelle Baynes. There is also no evidence that Minor was taking nearly an hour at the end of the day to close her office, unlike Julian. And the genesis of Julian's clash

with her supervisors over out-of-schedule pay stemmed from a computer glitch that did not impact Minor's pay. Julian's circumstances are simply not comparable to Minor's.[2]

The third element of a prima facie claim for hostile work environment requires that the alleged harassment be "objectively unreasonable"—a high bar. *Dediol*, 655 F.3d at 441. The alleged harassment must be "both objectively and subjectively offensive" and "sufficiently severe or pervasive to alter the conditions of the victim's employment." *E.E.O.C. v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007). In considering whether the conduct in question rises to this level, courts look to "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Id.*

Nothing Julian alleges approaches the requisite level of harassment— "objectively intimidating, hostile, or offensive"—to sustain an ADEA hostile-work-environment claim. *See Dediol*, 655 F.3d at 441. The alleged actions of her supervisors in no way reached the level of "severe or pervasive" harassment this court has required to state a claim.[3] "[D]isagreement[s]

---

[2] This argument is also somewhat misplaced, as evidence regarding "similarly situated" employees is more appropriate to support a disparate-treatment claim. *See Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 353 (5th Cir. 2007).

[3] Our caselaw is replete with examples of alleged incidents—well more severe than those alleged by Julian—that this court nonetheless concluded could not sustain a harassment claim. *E.g.*, *Saketkoo v. Admins. of Tulane Educ. Fund*, 31 F.4th 990, 1003–04 (5th Cir. 2022) (demeaning and abrasive comments and conduct from a supervisor not severe or pervasive enough for a harassment claim); *Septimus v. Univ. of Hou.*, 399 F.3d 601, 612 (5th Cir. 2005) (a "two-hour harangue," criticism of the plaintiff's work in a "mocking tone," and calling the plaintiff a "needy old girlfriend" insufficient); *cf. Woods v. Cantrell*, 29 F.4th 284, 285–86 (5th Cir. 2022) (being directly called a racial epithet by one's supervisor in front of fellow employees supports an actionable claim for hostile work environment). Even when sharp disagreements over employment terms have been

with an employer over terms of employment or an accommodation do not amount to harassment." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 585 (5th Cir. 2020).

Thus, being asked to clean the office during regular hours and close within fifteen minutes do not rise to objective harassment. Moreover, despite Julian's emphasizing the "fifteen minute" timeline imposed by Farney, the record indicates that Farney was willing to allow her up to thirty minutes to close. The overtime-pay demand letter from USPS was an administrative measure by the agency to reclaim money that it believed Julian was wrongly paid, a dispute that was eventually settled. And USPS quickly returned the $155 "garnishment" of Julian's wages when she raised the issue. Again, amalgamating these incidents, they do not represent a viable claim for hostile work environment. Accordingly, Julian's harassment claim based on age was properly dismissed.

Julian's Rehabilitation Act claim for hostile work environment fares no better. "[W]e have read the Rehabilitation Act together with the ADA in allowing a harassment claim under the Rehabilitation Act," *Carder v. Cont'l Airlines, Inc.*, 636 F.3d 172, 180 (5th Cir. 2011), though this court has also suggested that the elements for a harassment claim under the Rehabilitation Act are more stringent than an analogous claim brought under the ADA.[4]

---

intermingled with offensive conduct, this court has held non-pervasive incidents are not enough to state a claim. *See E.E.O.C. v. U.S. Drug Mart, Inc.*, No. 23-50075, 2024 WL 64766, at *1–2 (5th Cir. Jan. 5, 2024) (unpublished) (harsh scolding over disagreement with pandemic-era mask policy and calling a teenager "a disrespectful, stupid little kid" insufficient).

[4] More specifically, this court has considered the degree of nexus required between the alleged harassment and the plaintiff's disability under the Rehabilitation Act:

[T]he Rehabilitation Act requires that the discrimination be "solely by reason of her or his disability." Therefore, we believe a proper hostile

Yet Julian's disability-harassment claim fails even under the more generous ADA standard. To bring such a claim, a plaintiff must allege:

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

*Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003) (quoting *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235–36 (5th Cir. 2001)). Julian cannot establish a nexus between the alleged harassment and her disability, so she fails to establish a prima facie case.

Julian maintains that "[d]ay after day and month after month management under the direction of [MPOO] Winn continued to order Julian to work beyond her medical restrictions." But as explained above, there is no evidence to show that her supervisors were aware of Julian's purported standing/walking limitations. And no evidence from the time shows Winn or Farney—or Julian—referencing Julian's limitations as pertaining to her work duties.

We also note that the allegation that Winn ordered Julian to work beyond her medical restrictions lends itself more naturally to a failure-to-accommodate claim than a harassment claim. Such conduct is "not the type that courts have found to constitute harassment." *See Credeur v. Louisiana*

---

work environment claim based on the Rehabilitation Act would necessarily change the third element to read, "that the harassment complained of was based *solely* on her disability or disabilities."

*Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 506 n.8 (5th Cir. 2002).

*Through Off. of Att'y Gen.*, 860 F.3d 785, 796 (5th Cir. 2017).  And even if her supervisors' conduct approached something akin to harassment, it was not "sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment."  *See Flowers*, 247 F.3d at 236.  The record evidence before us does not show anything close to an abusive working environment akin to those underlying cognizable claims for hostile work environment.

\*    \*    \*

Julian fails to sustain prima facie claims for discrimination, either for disparate treatment or failure to accommodate.  Beyond that, she offers no evidence that USPS's legitimate, non-discriminatory reasons for its actions were a pretext for discrimination.  Her claims for age- and disability-based hostile work environment likewise fail to survive prima facie scrutiny, at least on the record before us.  The district court's summary judgment for the Postmaster General is

AFFIRMED.